*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0159p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICREL, INC.,
              *Plaintiff/Counter-Defendant/Appellant,*

              *v.*

No. 06-3177

TRW, INC., doing business as TRW Automotive
Electronics Group,
              *Defendant/Counter-Claimant/Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-02539—Dan A. Polster, District Judge.

Argued: April 24, 2007

Decided and Filed: May 4, 2007

Before: GUY, COLE, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Irene C. Keyse-Walker, TUCKER, ELLIS & WEST, Cleveland, Ohio, for Appellant.
Damond R. Mace, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.
**ON BRIEF:** Irene C. Keyse-Walker, TUCKER, ELLIS & WEST, Cleveland, Ohio, Maria S.
Bellafronto, Stephen J. Kottmeier, HOPKINS & CARLEY, San Jose, California, for Appellant.
Damond R. Mace, Mark J. Savage, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for
Appellee.

---

## OPINION

---

RALPH B. GUY, JR., Circuit Judge. Micrel, Inc., and TRW, Inc., d/b/a Automotive
Electronics Group, entered into agreements for Micrel to design and supply electronic circuits to be
used in airbag passive restraint systems. After trial on their competing claims and counterclaims for
breach of contract, the jury returned its verdict in favor of TRW and awarded damages in the amount
of $9,282,188. Judgment was entered accordingly, and Micrel's motion for new trial was denied.
Micrel appeals from the verdict, arguing that the district court erred by (1) allowing TRW's claim
for "cover" or "expectancy" damages; (2) failing to properly instruct the jury concerning the contract
claims or the proper measure of damages; and (3) refusing to give the jury interrogatories it
requested. Micrel also appeals from the district court's pretrial order granting summary judgment

1

to TRW on Micrel's claim of fraudulent inducement. After review of the record and the arguments presented on appeal, we affirm.

**I.**

TRW's automotive electronics business included assembling and selling components for airbag passive restraint systems to car manufacturers, including Toyota, Honda, and Daimler-Chrysler. The airbag modules required three application-specific integrated circuits (ASICs)—the dual, the quad, and the power supply squibs—which supply, monitor, and send electrical signals that fire the initiators that deploy the airbags. The dual squib is capable of triggering two airbags, the quad can trigger four, and the power supply provides power to all of the circuitry within the airbag control module. TRW's ASICs were being supplied by National Semiconductor Corporation, but TRW wanted to find a new supplier to provide lower cost "drop-in" replacements for the ASICs supplied by National. The search led TRW to Micrel.

In January 1998, TRW and Micrel executed the ASIC Development/Purchase Agreement (1998 Agreement). They agreed that Micrel would design the three ASICs to TRW's specifications and, if they conformed, TRW would purchase 100% of its ASIC requirements from Micrel through at least 2002. In February 2000, development had not been completed and the relationship broke down. TRW claimed that Micrel had failed to perform timely and terminated the agreement, while Micrel claimed that TRW had failed to give written notice of the deficiencies and an opportunity to cure. TRW and Micrel claimed to have incurred damages of $18 and $24 million, respectively. Mediation followed, but it was unsuccessful.

TRW and Micrel had a meeting in March 2001 to discuss a possible business solution to their dispute that would involve TRW's purchase of other products from Micrel. During those discussions, Micrel commented that it was a shame that the project had ended so close to completion, and TRW indicated that it wanted the potential lawsuit "off the books" because it had become a possible acquisition target. TRW suggested they consider resuming work on the ASIC project, and discussions followed over several months. Micrel insists that restarting the program depended on its ability to recoup the $3.9 million expended and many millions in profits lost under the 1998 Agreement.

During the discussions, TRW provided Micrel with estimates of the production volumes it anticipated for the years 2002, 2003, and 2004. TRW did not provide estimates beyond 2004, and disclosed that the ASICs would be replaced with a "next generation" ASIC already in development with another supplier. Micrel was unable to get TRW to commit to any minimum production quantities or provide estimates beyond 2004, but was assured that the volume of sales would decline slowly and not "fall off a cliff" after 2004. Micrel made its own projections of somewhat reduced quantities for 2005 and 2006, and was orally assured that those quantities were reasonable conservative estimates. Micrel was also concerned about whether there were "windows" by which it would have to deliver the ASICs, and was told that there were none.

On October 10, 2001, Micrel and TRW executed three agreements—(1) the Settlement and Mutual Release Agreement, (2) the ASIC Development Agreement, and (3) the ASIC Supply Agreement. Through these agreements, TRW and Micrel mutually released their respective claims under the 1998 Agreement and agreed to resume their plans to develop and produce the ASICs to replace the higher-cost units TRW was still purchasing from National. The Settlement recited that consideration for the releases specifically included the concurrent execution of the Development and

Supply Agreements.   All three agreements specified that Ohio law would govern, and each contained an integration clause.[1]

In the Development Agreement, Micrel committed to developing and testing ASICs that would meet TRW's specifications; and TRW agreed that, if the ASICs met the acceptance criteria, TRW would purchase production level quantities as provided for in the Supply Agreement.  The Development Agreement incorporated a development schedule that provided for a production release date of the third week of June 2002; declared that "time was of the essence" in Micrel's performance; and allowed for modification of the schedule to accommodate the design process upon the written approval of both parties.  Micrel was to do internal testing and produce up to 1500 units for TRW to test, and TRW agreed to promptly conduct its testing and to use commercially reasonable efforts to qualify Micrel's ASICs for use in TRW's customer applications.  TRW agreed to pay $250,000 upon execution of both the Development and the Supply Agreements; $125,000 on successful completion of Micrel's internal qualification of the ASICs; and, finally, $125,000 on successful completion of TRW's qualification.  Failure of either party to complete their obligations would be cause for termination, but termination would not become effective unless the breaching party failed to correct the deficiencies within a mutually agreed upon period not to exceed three months.  If either party terminated the Agreement for cause, then the ASIC Supply Agreement would also be deemed terminated for cause.

In the Supply Agreement, TRW committed to purchasing 100% of its requirements for the ASICs from Micrel, "if [Micrel] completes all development obligations under the ASIC Development Agreement," and "if [TRW] has orders from its customers for air bag modules that incorporate [Micrel]'s Products."  TRW's schedule of estimated production requirements for 2002, 2003, and 2004, totaling roughly 16 million parts, was attached to and incorporated into the Supply Agreement.   The Supply Agreement made clear, however, that these quantities were just that–estimates.  The Supply Agreement also provided that "this obligation is not, and will not be construed as a proscription against [TRW] purchasing next generation ASICs, or ASICs for other applications, from another supplier."  In fact, the same paragraph provided, in part, that:

> Upon successful completion of [Micrel's] internal qualification, [TRW] will discuss with [Micrel] commitments regarding production introduction of the Products and will provide production forecasts which are based on [TRW]'s customer forecasts at that time. [TRW] cannot guarantee that customers will accept airbag modules that incorporate the Products, or that customers will order airbag modules from [TRW] consistent with historic levels.  However, [TRW] will use reasonable commercial efforts in connection with [Micrel], to cause [TRW]'s customers to approve the use of airbag modules that incorporate [Micrel]'s Product. . . . [Micrel] recognizes that it will take time for [TRW] to qualify air bag modules manufactured for [TRW]'s customers using [Micrel]'s Product. [Micrel] recognizes that time is of the essence in meeting delivery deadlines, since [TRW]'s customers have no obligation to approve the ASICs  without adequate lead time. [Micrel] and [TRW] will use reasonable commercial efforts to cause [TRW]'s customers to approve the use of [Micrel]'s Product in [TRW]'s air bag modules.

Lest this be unclear, this paragraph closed by stating that:  "Notwithstanding anything in this Agreement to the contrary, [TRW] will only be obligated to purchase Product if it has orders from its customers for air bag modules that incorporate [Micrel]'s Products.  [Micrel] recognizes that the ultimate decision whether to purchase airbag modules that incorporate the Products lies with

---

[1]The integration clause in the Settlement Agreement more specifically stated that "all prior promises, inducements, agreements, statements, representations, and negotiations, whether oral or written, known or unknown are superseded by this Agreement and Release."

[TRW]'s customers." TRW also reserved the right to make changes to the specifications by written agreement. If any change caused an increase or decrease in development or production costs or the time required for production or delivery of the ASICs, Micrel was required to promptly notify TRW in writing. In such event, an equitable adjustment would be made and the agreement modified by written amendment to reflect the mutually agreed adjustment.

There is no dispute that there were further delays in development. On March 13, 2002, TRW's Director of Purchasing, Phil Roberts, wrote to Micrel's Area Sales Manager, Steve Carter, articulating concerns about the development program and explaining that TRW was "missing specific program application opportunities for Micrel product due to Micrel's delays in delivering product to TRW that will pass component and subsequent module qualification." Roberts identified several Model Year (MY) 2003 product validation testing opportunities that had been missed; indicated that design validation opportunities for MY 2004 had also been missed; and expressed TRW's understanding "that, based upon all issues known today and Micrel's schedule projections, TRW should see samples of the next revision of all three parts in approximately 5 weeks." TRW also confirmed that it was expecting a revised schedule shortly.

Micrel did not object, and sent TRW a proposed revised schedule on March 26, 2002, which would delay the ASIC production releases until September 2002 (dual), October 2002 (quad), and November 2002 (power supply). On April 11, 2002, TRW "reluctantly" accepted the revised schedule, but advised that due to the delays "the potential volumes for Micrel product will be significantly lower than the estimated volumes." In fact, TRW added that there did not appear to be any opportunity for production volume for calendar year 2002 and that the delays were beginning to adversely impact potential volumes for calendar year 2003. TRW closed by saying it would not be inclined to accept further delays.

Micrel sent another revised schedule to TRW on May 14, 2002, pushing the production release dates into January and February 2003. On May 29, 2002, TRW rejected this proposed revision, declared the Development Agreement terminated for cause, and acknowledged Micrel's right to an opportunity to correct the deficiencies within a period not to exceed three months. TRW added that under this proposed schedule, production validation in January or February 2003 would equate with a "best-case production volume start opportunity of July or August 2003." TRW added that several customers were requiring new design features that would not allow Micrel's ASICs to be used. At that time, TRW provided a much reduced estimate of the remaining production potential for 2003 and 2004 under the newly proposed schedule.

This letter prompted an internal assessment by Micrel, dated May 30, in which it was acknowledged that there had been "significant slip" in the development schedule from production releases in June 2002 to February 2003. Also, going forward, Micrel faced additional development costs, reduced estimates for production volumes, and a reasonable chance that the schedule could slip further. Micrel's response to TRW on June 13, 2002, rejected TRW's characterizations of the reasons for the delay, accused TRW of breaching the agreement, and expressed "extreme disappointment" with the drop in the estimated production volumes which it believed were disproportionate to the schedule delays they had experienced. Micrel closed by stating that, absent new forecasts, it would consider the Development Agreement terminated.

In December 2002, Micrel filed a nine-count complaint seeking rescission of the Settlement and Mutual Release Agreement on several grounds, including fraudulent inducement; asserting claims under the 1998 Agreement, including breach of contract; and alleging that TRW breached the 2001 Development and Supply Agreements. TRW answered and asserted its own claims for breach of the 2001 Agreements. TRW filed a motion for partial summary judgment on all of Micrel's claims except for breach of the 2001 Agreements, which was granted in part and denied in part in an order entered August 27, 2003. Although that order is not appealed from, it is of

interest that the district court denied summary judgment on the fraudulent inducement claim to allow Micrel further discovery on the issue of whether TRW's estimates were made in good faith, and whether TRW had a good faith intent in 2001 to purchase significant quantities of ASICs from Micrel.

After further discovery had been conducted, TRW renewed its motion for partial summary judgment. On May 17, 2005, the district court concluded that Micrel had not demonstrated a material question of fact for trial on the claim for fraudulent inducement. As discussed below, Micrel appeals from that decision. The remaining claims and counterclaims for breach of the 2001 Development and Supply Agreements were tried before a jury in July 2005. After two weeks of trial, the jury found in favor of TRW and against Micrel and awarded damages to TRW for $9,282,188. Judgment was entered accordingly, and Micrel moved for a new trial arguing that the verdict was against the weight of the evidence, that the instructions were improper and the interrogatories insufficiently specific, and that the damage award was irreconcilable with the evidence at trial. For the reasons set forth in an order entered December 22, 2005, the district court denied Micrel a new trial. This appeal followed.

## II.

### A.      Fraudulent Inducement

In its first claim of error, Micrel contends that it was error to grant summary judgment to TRW on the claim for rescission of the Settlement and Mutual Release Agreement on the grounds of fraudulent inducement. We review a district court's decision granting summary judgment *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under Ohio law, a contract procured by fraudulent inducement may be rescinded. When a plaintiff seeks to set aside a written document, clear and convincing evidence of fraud is required. *Household Fin. Corp. v. Altenberg*, 214 N.E.2d 667, 669-70 (Ohio 1966). To prove fraud or fraudulent inducement, a plaintiff must establish "(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *Lepera v. Fuson*, 613 N.E.2d 1060, 1063 (Ohio Ct. App. 1992); *see also Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 409 (Ohio 1984).

The district court addressed each allegedly false representation or concealment of fact and found that none could support Micrel's claim of fraudulent inducement. The claim includes allegations that TRW intentionally misrepresented and overstated the estimated production volumes; falsely represented that there were no "windows" that had to be met; falsely represented the intention to work with Micrel to get the ASICs qualified; falsely represented that introduction of the next-generation ASIC would have no impact on the estimates; and concealed the fact that the next-generation ASIC would replace the parts Micrel was developing. Without directly contesting the bulk of the district court's findings, Micrel argues that the district court misapprehended its claim for promissory fraud and misapplied the parol evidence rule. On the contrary, we find that the district court accurately stated the relevant law and did not err in finding that Micrel failed to come forward with sufficient evidence from which a rational juror could find, by clear and convincing

evidence, that TRW fraudulently induced Micrel to enter into the Settlement and Mutual Release Agreement.

The district court did not err in recognizing that, as a general rule, fraud cannot be predicated upon representations concerning future events because they are more in the nature of predictions or opinions about what the future may hold. *Link v. Leadworks Corp.*, 607 N.E.2d 1140, 1145 (Ohio Ct. App. 1992); *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 778 N.E.2d 80, 89 (Ohio Ct. App. 2002). It is also true, as Micrel argues and the district court noted, that a promise made with a present intention not to perform constitutes a misrepresentation of existing fact even if the promised performance is to occur in the future. *Link*, 607 N.E.2d at 1145; *see also Tibbs v. Nat'l Homes Constr. Corp.*, 369 N.E.2d 1218, 1223 (Ohio Ct. App. 1977) ("the requisite  misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent").

On appeal, Micrel characterizes its claim as one based on promissory fraud and contends that parol evidence may be used to prove promissory fraud. While generally true, the Ohio Supreme Court has explained that it is not always so. The parol evidence rule "as applied in contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), becomes the contract of the parties. . . . Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself." *Galmish v. Cicchini*, 734 N.E.2d 782, 789 (Ohio 2000) (citation omitted). Because the parol evidence rule cannot be used as a shield to prevent proof of fraud, however, it "does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." *Id.* Nonetheless, the parol evidence rule "may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing." *Id*. at 790 (internal quotation marks omitted). In other words, "the parol evidence rule does apply 'to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible.'" *Id*. at 791 (citation omitted); *see also Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 454-59 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1429 (2006). With this in mind, we turn to Micrel's claim that it was induced to release its claims by TRW's implied promise to perform in good faith under the 2001 Development and Supply Agreements.

Micrel continues to argue that TRW falsely inflated the estimated sales volumes. The district court did not err in finding that the estimates themselves were predictions of future facts that could not establish fraud. Nor could Micrel rely on oral promises to purchase the estimated quantities or assurances that sales volumes would not "fall off a cliff" with the introduction of the next-generation ASIC. Because such promises would contradict the terms of an integrated written agreement, the parol evidence rule precludes reliance on them even to establish promissory fraud. As discussed earlier, the 2001 Supply Agreement made plain that the estimates were only estimates and the purchase of production quantities depended on a number of variables, including conformance to specifications, successful product testing and validation, and the approval of TRW's customers. Even so, as the district court observed, the evidence showed that TRW's  purchases of the ASICs from National for 2002, 2003, and 2004 actually met or exceeded the estimated quantities incorporated into the Supply Agreement.[2]

Relatedly, Micrel also argued that TRW misrepresented the impact that the next-generation ASIC would have on the estimates for the three ASICs being developed by Micrel and supplied by

---

[2]The district court observed that TRW purchased more than 7.1 million ASICs from National in 2002 (in excess of the estimated 4.5 million); more than 6.8 million in 2003 (over the estimated 6.142 million); and that, by June 2004, had purchased more than 4 million and was on target to exceed the estimated 5.4 million. In all, roughly 18 million ASICs were purchased from National (at prices higher than would have been paid to Micrel).

National.  It is undisputed that TRW informed Micrel that the next-generation ASIC—once developed and qualified—would go into new designs and would reduce TRW's requirements for the current ASICs.  Micrel relied on parol evidence to show that TRW knew in August 2001, before the Agreements were signed, that the next-generation ASIC would substantially reduce the applications for the ASICs to be developed by Micrel.  Specifically, Micrel relies on an internal e-mail from early August 2001 referencing alternative projections of estimated requirements for the current generation ASICs.  The first chart estimated total requirements for 2002, 2003, and 2004 of 17.2 million, while the second chart estimated a total of 12.3 million on the assumption that the next generation ASIC would be incorporated into new designs for specific platforms.  Ronald Muckley, identified by Micrel as TRW's top decision maker, responded to the e-mail interjecting:

> In order to cut short on [sic] discussion of alternatives.  We had to provide Micrel with minimum volumes for three years.  Those included most if not all the current volume planned for National.  We will not under any circumstances deviate from those commitments.  Thank you.

Micrel would interpret this as a directive to withhold from Micrel the fact that the estimates provided had overstated the projected requirements for Micrel's ASICs.  Muckley testified, however, that it was an internal confirmation that TRW would be committed to purchasing the current-generation ASICs consistent with the estimates provided to Micrel.  The recipients also testified that they understood the response to mean TRW would live up to the forecasts and estimates to the best of its ability.  The district court did not find that this evidence should be excluded by the parol evidence rule (contrary to Micrel's assertion on appeal), but rather ruled that "[n]ot only is Micrel's interpretation of this e-mail questionable, it is irrelevant because the estimates TRW provided to Micrel understated the quantity of current-generation ASICs that TRW could have purchased from Micrel and eventually purchased from National at higher prices."

Next, without further explanation, Micrel reiterates that it was assured that there were no "windows" that had to be met.  Specifically, according to Micrel, when the question of "windows" came up about ten days before the 2001 Agreements were signed, TRW confirmed that there were none and assured Micrel that product qualifications would begin as soon as the prototypes were delivered.  As the district court aptly explained, however, all understood that there was a development schedule that required testing, validation, and customer approval before the ASICs could be incorporated into the airbag modules.  Delays in those steps would necessarily delay production release and would result in missed opportunities to get Micrel's ASICs qualified and approved as replacements for those being supplied by National.

In an attack on TRW's motivations, Micrel asserts that TRW never intended to perform in good faith under the 2001 Agreements, but was simply contracting with Micrel to extract price concessions from National while pursuing development of the next-generation ASIC with another supplier.  Micrel offered no direct evidence of this, but argued that it could be inferred from a chronology of the negotiations TRW had with National and Micrel, respectively.  The evidence showed that TRW demanded price reductions from its suppliers, including National, and even the agreement with Micrel provided for at least three price "rollbacks."  Given that National was TRW's only supplier for the custom-made ASICs, it is hardly significant that TRW was periodically engaged in negotiations with National.

Moreover, any inference of promissory fraud is negated by evidence that TRW passed the promised cost savings from Micrel's ASICs on to its customers, engaged in internal planning to implement a switch to Micrel's parts, and expressed frustration internally when they missed opportunities for validation of Micrel's parts.  It is also clear that TRW had a financial incentive in having Micrel succeed and provide lower-cost ASICs to go into the airbag modules.  In fact, there is no dispute that, at all times, TRW paid National higher prices for the ASICs than TRW had agreed

to pay Micrel for its ASICs. Of course, as the district court observed, whether TRW (or Micrel) later breached the 2001 Development and Supply Agreements was a separate question from whether TRW entered into the agreements without a present intention to develop and purchase its requirements for the current-generation ASICs from Micrel.

We find that Micrel has failed to present sufficient evidence from which a rational trier of fact could conclude, by clear and convincing evidence, that TRW entered into the 2001 Agreements without a present intention to perform. Accordingly, Micrel has not demonstrated that the district court erred in granting summary judgment to TRW on this claim.[3]

## B.    Trial Error

At the conclusion of trial, the jury was instructed both on Micrel's claim that TRW breached the 2001 Development and Supply Agreements, and on TRW's counterclaim that it was Micrel that breached those same agreements. In seeking a new trial, Micrel argued that the verdict in favor of TRW was against the weight of the evidence. Disagreeing, the district court concluded that: "Overwhelming evidence at trial established that it was Micrel, not TRW, which breached the 2001 Agreements." Micrel does not appeal from that determination or otherwise contest the finding that it was in breach of its obligations under the Development Agreement. Rather, Micrel's appeal attacks from several perspectives the award of damages based on the failure to supply production quantities of ASICs to TRW. For the reasons that follow, we find the district court committed no reversible error.

### 1.    Measure of Damages

Micrel argues that the district court erred by allowing TRW to seek "cover" damages under the Uniform Commercial Code (UCC), or "expectancy" damages under the common law, which were based almost entirely on the unrealized savings it expected from the use of Micrel's lower-cost replacement parts. Before discussing whether these damages were available as a matter of law, it should be kept in mind that, although the issue is before us on appeal from the award in favor of TRW, Micrel also sought to recover "expectancy" damages equal to the lost profits it would have earned from the sale of production quantities of its ASICs under the Supply Agreement.

The district court instructed the jury in connection with both parties' claims that if one party proved that the other breached the contracts, that party would be entitled to damages "in an amount sufficient to place [the party] in the same position in which it would have been if the contracts had been fully performed by [the other]"; that the jury "may not award damages that are remote or speculative"; and that the jury

> may only award those damages that were the natural and probable result of the breach, or that were reasonably within the contemplation of the parties as the probable result of the breach. This does not require that [the breaching party] actually be aware of the damages that will result from the breach so long as the damages were reasonably foreseeable at the time the parties entered into the Agreements as a probable result of the breach.

---

[3] Even if that were not the case, we would not agree with Micrel's further contention that entry of summary judgment on this claim deprived Micrel of a fair trial on its breach of contract claims. The district court permitted evidence of pre-2001 conduct at trial and over TRW's objections; instructed the jury that "evidence which predates October 10, 2001, may be considered by you in evaluating the parties' conduct after October 10, 2001"; and, commented, in denying Micrel's motion for new trial, that "[o]ne reviewing the trial transcript could almost say that, despite the Court's legal ruling and limiting instruction, Micrel tried its fraudulent inducement claim to the jury and lost."

With respect to Micrel's claim, the jury was instructed that Micrel sought to recover lost profits and that to award lost profits, "you must find that the profits were within the contemplation of the parties at the time the contracts were made and that the loss of profits was the probable result of TRW's breach"—the lost profits being, of course, based on the sale of production quantities of the ASICs under the Supply Agreement. In addition to the instructions for contract damages, the jury was also instructed on TRW's claim for cover damages. The district court explained that if Micrel breached the parties' contracts, and "TRW made reasonable purchase of substitute parts in good faith and without unreasonable delay, TRW is entitled to recover the amounts by which the cost of the substitute parts exceeded the contract price."

In terms of TRW's proofs, nearly all of TRW's damage award was based on the differential between what TRW paid National and what TRW would have paid Micrel for the replacement ASICs from the end of 2002 through 2004. The amount of TRW's request of more than $9.66 million took into account the agreed-upon extension of the production release dates, interest, and a reduction to present value. In denying the motion for new trial, the district court specifically found that the damage award of more than $9.28 million was "a reasonable number within the range of proof presented by the parties."

### a.        "Expectancy" Damages

As the jury was instructed, Ohio law provides that: "Damages for a breach of contract are those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of the making of the contract." *The Toledo Group, Inc. v. Benton Indus., Inc.*, 623 N.E.2d 205, 211 (Ohio Ct. App. 1993). Micrel argues that damages based on the failure to supply the replacement parts were not in the contemplation of the parties, and were not the natural or probable consequence of the breach of obligations under the Development Agreement. We find that, although the jury was free to find that damages flowing from the failure to supply parts were not contemplated by the parties, the district court did not err in rejecting Micrel's argument that such damages were unavailable as a matter of law.

The 2001 Agreements, although separate contracts, were executed concurrently and, by all accounts, with the intention to both develop and supply millions of "replacement" parts over a three-year period. The Development Agreement stated at the outset that both parties wanted Micrel to complete development of the ASICs, and that if the ASICs met the acceptance criteria, TRW "want[ed] to buy ASICs from [Micrel] in production quantities as provided in the ASIC Supply Agreement being executed concurrently with this Agreement." Micrel makes clear that it would not have entered into those agreements unless they contemplated that Micrel would supply TRW's requirements. In fact, the Development and Supply Agreements provided the consideration for the mutual release of claims that each valued at more than twice the amount of damages awarded to TRW.

Micrel also argues that the Development Agreement did not incorporate a guarantee that its ASICs would be acceptable to TRW. Micrel did, however, expressly warrant that the ASICs developed during the development process would conform to the specifications and would meet all applicable quality requirements. In its reply brief, Micrel relies on the provision in the Development Agreement that if Micrel was unable to manufacture and supply the ASICs in a manner competitive in terms of quality, delivery, technology, and service, and Micrel was unable to correct the deficiencies within 3 months, TRW "*may* request that [Micrel] provide to another supplier information for the manufacture and supply" of the ASICs and Micrel "shall make commercially reasonable efforts to negotiate a license with said supplier for any intellectual property rights [Micrel] may hold." (Emphasis added.) This, Micrel seems to argue, limited TRW's remedies to finding a new lower-cost supplier, but precluded recovery of the difference between Micrel's agreed

prices and National's prices. While this was certainly *one* of TRW's available remedies, the agreements did not provide that this would be TRW's *exclusive* remedy.

Relatedly, Micrel argues that damages for failure to supply the replacement ASICs could not be the natural and probable result of Micrel's breach of its obligations under the Development Agreement. The essence of this argument seems to be that even without Micrel's breach, TRW could not show that the parts would have passed product qualifications, would have been produced at the agreed lower prices, or would have been approved by TRW's customers. Arguing that it is impossible to know whether the replacement ASICs would have been acceptable to TRW and its customers in terms of performance and price, Micrel contends that damages based on the millions of replacement parts the parties anticipated Micrel would produce were too speculative. The jury did not think so, and we cannot agree with Micrel that *no* reasonable juror could conclude that such damages were the natural and probable result of Micrel's breach.

Finally, Micrel argued that its claim for lost profits was not barred because it was TRW's breach that prevented Micrel from performing and caused the failure of at least one condition precedent to its obligations under the Supply Agreement. In fact, this was the issue for the jury to determine, whether Micrel or TRW, or both, had breached the obligations under the Development Agreement. The jury was instructed generally and in connection with both the claim and counterclaim that:

> A contract is breached when one party fails or refuses to perform its duties under the contract.

> A party is in material breach of contract when it violates a term essential to the purpose of the contract. A material breach by one party excuses the other party from performing its remaining obligations under the agreement. Mere nominal, trifling, slight or technical departures from the contract terms are not material breaches so long as they occur in good faith.

> Good faith means honesty in fact in the conduct or transaction.

> As part of a contract, parties may agree to a condition, which is to occur before performance under a contract becomes due. This is called a condition precedent. However, no party can insist upon a condition precedent when the non-performance of the condition has been caused by that party. Where a party's conduct prevents the occurrence of a condition, that party cannot avail itself of that conduct to avoid liability to the other party to the contract. One cannot avoid liability by preventing the performance of a condition precedent.

The jury, instructed on breach and conditions precedent, sided with TRW. We cannot agree with Micrel that the existence of the conditions precedent necessarily excused its performance under the Supply Agreement, or established as a matter of law that the parties did not contemplate that damages for breach of the Development Agreement could include lost profits or unrealized savings resulting from the failure to purchase or supply production quantities of parts under the Supply Agreement.

### b.    Cover Damages

Micrel contends that it was also error to allow the jury to consider "cover" damages based on the difference in the prices paid for National's parts and the prices that would have been paid to Micrel for the replacement parts under the Supply Agreement. The UCC applies to "transactions in goods" and allows for "cover" when, among other things, a seller fails to make delivery. OHIO REV. CODE § 1305.85(A). The buyer is entitled to "cover" by making "reasonable purchase of or

contract to purchase goods in substitution for those due from the seller." OHIO REV. CODE § 1302.86(A). The jury was instructed that if Micrel breached the parties' contracts, and "TRW made a reasonable purchase of substitute parts in good faith and without unreasonable delay, TRW is entitled to recover the amounts by which the cost of the substitute parts exceeded the contract price."

On appeal, Micrel argues that TRW could not recover cover damages because the UCC only applies to contract for the sale of goods. When a contract is a "mixed goods and services contract," "the test for the inclusion in or the exclusion from sales provisions [of the UCC] is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." *Allied Indus. Serv. Corp. v. Kasle Iron Metals, Inc.*, 405 N.E.2d 307, 310 (Ohio Ct. App. 1977) (holding that contract for design and installation of pollution control system was predominantly one for services). Reading the Development and Supply Agreements together, the district court found that the contract was predominantly one for the sale of goods, not the rendition of services. We agree. Despite the design and testing obligations in the Development Agreement, the predominant factor and purpose was to develop and supply millions of replacement parts.

Next, Micrel argues that even if the UCC does apply, TRW would not be entitled to its cover damages because "termination" of the agreements discharged any executory obligations. However, as TRW responds, this argument overlooks the UCC's definition of "termination" as occurring "when either party pursuant to a power created by agreement or law puts an end to the contract *otherwise than for its breach*. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." OHIO REV. CODE § 1302.01(A)(13) (emphasis added).

Finally, we agree with the district court that because the jury was entitled to consider this measure of damages under common law contract theory, any error in also instructing the jury on cover damages was harmless. ("In the end, it makes no difference whether the jury awarded TRW damages under the common law or the UCC because under either measure, TRW's damages are the same and supported by the evidence.")

### 2.      Jury Instructions and Interrogatories

Jury instructions are reviewed as a whole to determine whether they fairly and adequately present the issues and applicable law to aid the jury in making its determination. *Fisher v. Ford Motor Co.*, 224 F.3d 570, 576 (6th Cir. 2000). While the correctness of jury instructions is a question of law, which we review *de novo*, the refusal to give a specifically requested instruction is reviewed for abuse of discretion. *Id.* A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial. *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990).

Micrel argues, as it did in the motion for new trial, that the instructions were improper and misleading because they gave the jury no "realistic option" of considering the Development and Supply Agreements separately. While the instructions concerning definitions and elements referred to contracts in the plural, the jury was instructed at the outset that "[s]ome agreements may be encompassed in more than one written document," and that "[s]eparate agreements or documents that are related or part of the same transaction may be read together." There is no dispute that this is an accurate statement of Ohio contract law. *See, e.g., Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) ("a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole"); *Prudential Ins. Co. of Am. v. Corp. Circle, Ltd.*, 658 N.E.2d 1066, 1069 (Ohio Ct. App. 1995) ("all writings that are a part of the same

transaction should be interpreted together"). Nor can there be any reasonable doubt that the Development and Supply Agreements are properly read together. Micrel's president agreed that the overall goal of the agreements was not only to develop ASICs meeting TRW's specifications, but also to supply production quantities of ASICs for integration in the airbag modules sold to TRW's customers.

This error, Micrel claims, was amplified by the district court's refusal to give several requested instructions. Refusal to give a requested instruction is an abuse of discretion if "(1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997). First, Micrel complains that the district court refused to instruct the jury separately on the elements of the claims for breach of contract arising under the Development Agreement and Supply Agreements, respectively. The jury was instructed that Micrel claimed that TRW had "breached the agreements"

> in one or more of the following ways: By requiring Micrel to meet requirements that were not provided for in the Agreements; by failing to promptly test the sample ASICs that Micrel provided to TRW and by failing to promptly report test results to Micrel; by not using commercially reasonable efforts to have TRW's customers approve use of Micrel's ASICs in TRW's modules; by refusing to grant Micrel a commercially reasonable schedule extension; by reducing its ASICs volume estimates in bad faith; and by failing to timely perform other obligations TRW had under the contracts.

The jury was similarly instructed on TRW's counterclaim that Micrel "breached the agreements"

> in one or more of the following ways: By failing to comply with the "[t]ime is of the essence" clause and the contract schedule deadlines; by failing to submit a final release package to TRW; by failing to produce parts that were needed for product verification testing, and by failing to rework parts that failed to meet the specifications; by failing to complete product qualifications; by failing to complete the tri-temp test and characterization plan; by failing to supply parts that met Micrel's warranty in the Development Agreement; and by failing to timely perform other obligations Micrel had under the contracts.

Because it was proper to read the contracts together, it was not error to structure the instructions in this fashion. Nor was it error to omit as an element of TRW's claim the satisfaction of conditions precedent. As outlined earlier, the district court included in its general instructions the applicable law concerning conditions precedent. The instructions, repeated in connection with both parties' claims, explained that while parties may agree to a condition that must "occur before performance under a contract becomes due," "no party can insist upon a condition precedent when the non-performance of the condition has been caused by that party."

Micrel also complains that the district court refused to give an instruction explaining Micrel's theory that TRW breached the duty of good faith when it drastically reduced the estimates of production quantities for the replacement ASICs. However, the record indicates that when Micrel's counsel objected, the district court responded: "The record is clear that both sides proposed some changes and I incorporated their changes. If you want something in here that highlights your claim that TRW changed its estimates, or wording to that effect, I'll add that as one of your claims." With counsel's concurrence, the claim that TRW breached the contracts by reducing the ASIC volume estimates in bad faith was specifically added as one of the ways in which Micrel claimed TRW had breached their agreements.

Finally, the trial court may submit interrogatories to a jury on issues of fact that are necessary to the verdict, but is not required to do so. FED. R. CIV. P. 49(b). The use of special or general verdicts, as well as the content and form of any interrogatories submitted to the jury, are matters within the discretion of the district court. *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1520 (6th Cir. 1990); *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 527 (6th Cir. 2004). Micrel initially proposed interrogatories covering the parties' breach of contract and breach of warranty claims, 25 of which pertained to the breach of contract claims and separately queried the jury on the elements of the claims for breach of the Development Agreement and Supply Agreement.

The district court elected to give four interrogatories, two on Micrel's claims and two on TRW's counterclaims, asking first whether each had proved by a preponderance of the evidence that the other had "breached its contractual obligations" to the other "in connection with the development and supply of parts that were to be used in TRW's airbag control modules." Then, if the answer was "yes," the second interrogatory asked "what amount of damages do you find by a preponderance of the evidence would fairly and reasonably compensate [the party] for its actual loss resulting from [the other's] breach of contract." We can find no abuse of discretion in the district court's refusal to give the extensive and potentially confusing interrogatories proposed by Micrel.

**AFFIRMED.**