RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0149p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                           *Plaintiff-Appellee,*

     *v.*

                          No. 13-1578

SALAH DADO,

                           *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:09-cr-20523-9—Thomas L. Ludington, District Judge.

Argued: March 13, 2014

Decided and Filed: July 10, 2014

Before: MERRITT, MOORE, and CLAY, Circuit Judges.

_____

### COUNSEL

**ARGUED:** N. C. Deday LaRene, LARENE & KRIGER, P.L.C., Detroit, Michigan, for Appellant. Janet Parker, UNITED STATES ATTORNEY'S OFFICE, Bay City, Michigan, for Appellee. **ON BRIEF:** N. C. Deday LaRene, LARENE & KRIGER, P.L.C., Detroit, Michigan, for Appellant. Janet Parker, UNITED STATES ATTORNEY'S OFFICE, Bay City, Michigan, for Appellee.

     CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. MERRITT, J. (pp. 26–28), delivered a separate dissenting opinion.

1

---

**OPINION**

---

CLAY, Circuit Judge.   Defendant Salah Dado appeals his convictions and 20-year mandatory minimum sentence for conspiracy to manufacture, distribute, or possess 1,000 or more marijuana plants with intent to distribute, in violation of 21 U.S.C. § 846; and aiding and abetting the manufacture of 1,000 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vii).   For the reasons set forth below, we reject Defendant's arguments for reversal, and **AFFIRM** Defendant's convictions and sentence.

## BACKGROUND

On October 13, 2009, after observing suspicious activity and marijuana in plain sight, officers from a multi-law enforcement agency drug task force lawfully obtained and executed a search warrant at the residence of Rocky and Cory Corlew in Gladwin, Michigan.  Pursuant to the search warrant, officers confiscated over 93 pounds of processed marijuana in addition to 1,287 marijuana plants that were growing in the Corlews' residence and on the surrounding property.  Officers also seized from the Corlews' residence cash, numerous firearms, and various tools used for growing and processing large quantities of marijuana.

As the investigation progressed, additional participants were identified.  In addition to Rocky and Cory Corlew, officers discovered that Michael "Mike" Szemites, David Howard, Eric Schweikert, Timothy Bunting, Christopher Threet, and Nathan Stover were each involved with the physical process of growing, harvesting, and processing the marijuana plants.  Defendant, a businessman who operated liquor stores in Flint, Michigan, funded the operation and distributed the finished product.  Defendant did not participate in the physical process of growing and manufacturing marijuana.  Rather, Defendant provided substantial capital for the tools and equipment necessary to cultivate, harvest, and process the marijuana plants, and also purchased and distributed most of the processed marijuana.  The marijuana growing operation had produced between 4,000 and 5,000 marijuana plants in 2009.

On May 13, 2011, Defendant was indicted for conspiracy to manufacture marijuana plants in violation of 21 U.S.C. § 846, and for aiding and abetting in manufacturing marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Cory Corlew, Rocky Corlew, Michael Szemites, Eric Schweikert, Nathan Stover, Timothy Bunting, David Howard, Christopher Threet were also charged in connection with the marijuana growing operation. Defendant was arrested at a liquor store that he operated in the Flint, Michigan area. With Defendant's consent, officers searched the store and Defendant's car. Officers recovered marijuana, a digital scale, and a loaded semi-automatic handgun inside the liquor store. In addition, they found small containers of marijuana in Defendant's car. These items were eventually introduced by the government as evidence at Defendant's trial.

Because Defendant had incurred a prior felony drug conviction in 2005 (possession with intent to deliver over 5 kilograms of marijuana), the government gave him notice that his sentence on any count of conviction would be enhanced. Unlike his co-defendants, all of whom pled guilty pursuant to their respective plea agreements, Defendant opted to proceed to trial.

During Defendant's trial, the jury heard testimony from numerous witnesses who connected Defendant to the marijuana manufacturing operation. Rocky Corlew testified that it cost approximately $15,000 to run the marijuana manufacturing operation in 2009, and that most of the money had come from Defendant, who had given it to Mike Szemites. Cory Corlew testified that "Rocky didn't have the means or the money to run that grow operation, and they would get money from [Defendant]." (R. 331, Trial Tr. III at 234.) Both Cory and Rocky Corlew also testified that, in addition to relying on Defendant to buy tools and equipment to grow the marijuana plants, the operation also relied on Defendant to buy the processed marijuana. Rocky testified that he had expected Defendant would buy "most of" the marijuana produced by the 2009 crop (approximately "a thousand pounds" of processed marijuana) at $3,000 per pound. In addition, the jury heard testimony from a marijuana grower named Richard Anderson who had met and talked to Rocky Corlew and Michael Szemites in the Clare County Jail following their arrest in this case. Anderson testified that Corlew and Szemites told him that "they had a guy that bought quite a bit of [marijuana], for $3,000 a pound. . . . They said he

owned stores in Flint. I think it was liquor stores. They didn't say his name or describe what he looked like or anything." (R. 334, Trial Tr. VI at 540.)

Witnesses also testified that Defendant had indeed purchased most of the marijuana that had been harvested and processed before the operation was discovered in October 2009. Rocky testified that Defendant had purchased approximately "fifteen" of the twenty pounds of marijuana that had been sold before the police raid, and that he and Cory had received about $7,000 to $8,000 in cash from Defendant's purchase of the pre-raid 2009 crop. Eric Schweikert testified that Defendant also purchased and distributed additional marijuana processed from plants that police did not find during the raid. Schweikert testified that he gave at least one pound of marijuana from that crop to Defendant, who sold it for $5,000, and gave the money to Schweikert.[1] Cory Corlew testified, "Any time I heard [Defendant's] name mentioned, it was either regarding him giving [Mike Szemites] and Rocky money or for the growth of marijuana or in terms of him buying marijuana that was grown." (R. 331, Trial Tr. III at 219.)

The prosecution also called as a witness Defendant's self-proclaimed best friend, Jon Abbott. Abbott was not a co-conspirator in the marijuana manufacturing operation on the Corlew's property, but had been involved with some marijuana related transactions in the past, and apparently trafficked marijuana with Defendant at some point prior to 2008. Abbott is also a friend of Mike Szemites and the Corlews.

Abbott testified that Mike Szemites had informed him in early 2009 about the marijuana growing operation conducted "at Rocky's house . . . up north," and that Szemites asked him to back the project financially, which Abbott declined to do. (R. 334, Trial Tr. VI at 559.) Abbott also testified that during the summer of 2009, he and Defendant had multiple conversations concerning the ongoing marijuana production on the Corlews' property. Abbott said that Defendant encouraged him to invest in the operation, and indicated Defendant himself had invested at least $1,500 at that point. Abbott also testified that Defendant had expressed concern about the possibility that growing 3,000 marijuana plants outdoors might result in detection of the operation by law enforcement. Further, Abbott testified that Defendant expected to get

---

[1]Defendant later directed Schweikert to return the money, and used the money to hire an attorney to represent Mike Szemites.

marijuana in return for his contributions, and claimed that when the operation was discovered and raided by the police, Defendant had already received at least "five and a half pounds" of processed marijuana.  In addition, Abbott testified that after police uncovered the operation, Defendant advised him not to contact Szemites because things had been "busted up north." Abbott also corroborated Eric Schweikert's testimony that Defendant received "a couple pounds" of marijuana from the unrecovered plants that Schweikert harvested and processed after the raid.

During the trial, defense counsel cross-examined Abbott about his hope of leniency or protection from prosecution for a marijuana related transaction that was pending investigation in state court.  No state or federal charges had been filed against Abbott at the time of Defendant's trial.  Abbott admitted that he was "hoping that by providing truthful testimony, that will be taken into consideration by the state authorities in the handling of [his] cases[.]"  (R. 334, Trial Tr. VI at 55.)

At the conclusion of Defendant's trial, the jury was instructed on the elements of the charged offenses.  For the conspiracy charge in Count One, the district court explained:

> With regard to the second element—the defendant's connection to the conspiracy—the government must prove that the defendant knowingly and voluntarily joined that agreement . . . This does not require proof that the defendant knew the drug involved was marijuana.  It is enough that the defendant knew that it was some kind of controlled substance.  Nor does this require proof that the defendant knew how much marijuana was involved.  It is enough that the defendant knew that some quantity was involved.

(R. 319, Jury Instructions at 11.)  The jury was also asked to determine the quantity of the controlled substance involved in each charged offense.  The district court instructed the jury that it was required to make its findings as to drug quantities unanimously and beyond reasonable doubt, and that Defendant did not have to be shown to have had knowledge of those quantities:

> In determining the quantity of the controlled substance involved in the conspiracy as a whole, or in Count 4 [aiding and abetting manufacture], you need not find that the defendant knew the quantity involved in the offense.

(R. 319, Jury Instructions at 17.)

At the conclusion of the trial, the jury found Defendant guilty of conspiracy to manufacture, distribute, or possess with intent to distribute marijuana; and aiding and abetting the manufacture of marijuana.  With regard to the conspiracy charge, the jury found that "the conspiracy as a whole involved . . . 1000 or more marijuana plants, . . . or 1,000 kilograms or more of marijuana."  (R. 322, Jury Verdict Form at 1.)  With regard to the manufacturing charge, the jury found that the offense involved 1,000 or more marijuana plants.

After the verdicts, Defendant fired his retained trial attorneys and retained new counsel.  In the course of the post-verdict investigation, the government provided Defendant's counsel with a memorandum from the case agent, DEA Special Agent Robert DeRocher.   The memorandum appears to have been prepared at the request of the trial prosecutor after the conclusion of Defendant's criminal trial.  It provides in pertinent part:

> On either March 9th or March 10th, 201l, at 1:00 p.m., [Special Agent] DeRocher and TFO Cedric Kendal went to Attorney [Al] Zerka's office and met with Jon Abbott, with Attorney Zerka present.  Abbott initially wanted immunity for talking with me and TFO Kendal. Attorney Zerka stated that Abbott's information related to ▮▮▮'s involvement in the marijuana grow.[2]  I told Abbott that I could not give immunity/nor did I have the authorization to do so. I stated I would notify the prosecutors of his cooperation. Abbott asked about the Witness Protection program; I told him that was up to the US Marshall's, but that program was very rare.  I told him that no promises will be made because I didn't even know what he was talking about.  After at least 15 minutes of telling Abbott that I would not promise anything he finally told me about ▮▮▮. He said ▮▮▮ had burned down his house, collected the insurance money and tried to parlay the insurance money into the Muma Rd marijuana grow, through his brother**.** ▮▮▮ had intentionally poured a bottle of liquor on his computer to start the fire. The focus of the interview was about ▮▮▮. Abbott said that ▮▮▮ was a mean person and that he was scared of him. Attorney Zerka showed me a picture of ▮▮▮ that he had on his computer.
>
> A few days later, I was notified by [Flint Area Narcotics Group] Lt. [David] Rampy, that Abbott claimed I promised him immunity. I told Lt. Rampy that was not true.
>
> I investigated Abbott's claim, regarding ▮▮▮ but could not gather any additional information. The Michigan State Police Fire Marshall could not find any house fires for ▮▮▮ or house fires for address I had linked to ▮▮▮.

---

[2]According to the parties, the individual whose name is redacted is the brother of one of the co-defendants.

> A few months later I called Attorney Zerka, and requested Abbott confirm the address of the House fire. Attorney Zerka called me back and confirmed the address I already had.

(R. 340-3.)

Defendant filed a post-verdict motion for a new trial, arguing that the prosecution withheld material evidence in violation of Defendant's due process rights, as recognized by *Brady v. Maryland*, 373 U.S. 83 (1963), and that Defendant's trial counsel rendered ineffective assistance in violation of Defendant's Sixth Amendment rights, as recognized by *Strickland v. Washington*, 466 US 668 (1984). The district court held three days of evidentiary hearings, and heard testimony from numerous witnesses. At the conclusion of the hearing, the district court denied Defendant's motion for a new trial in a comprehensive, thirty-four page opinion. *United States v. Dado*, No. 09-20523-09, 2013 WL 183997 at *9 (E.D. Mich. Jan. 17, 2013).

In computing Defendant's sentence, the district court added two points for obstruction of justice for making or causing others to make threats against cooperating co-conspirators. The court also found that Defendant had provided false information to his probation officer regarding his assets. Nevertheless, Defendant's resulting guideline range—135 to 168 months—was eclipsed by the statutory mandatory penalty provided for his offenses in 21 U.S.C. § 841. On April 22, 2013, Defendant was sentenced to concurrent, mandatory minimum sentences of 20 years, to be followed by concurrent, statutorily mandated supervised release terms of 10 years. Defendant timely appealed.

## DISCUSSION

Defendant asserts three grounds for appeal. First, Defendant challenges the district court's denial of his motion for a new trial based on alleged *Brady* and *Strickland* violations. Next, Defendant contends that the district court erred in declining to deliver a "buyer-seller" jury instruction, and that the error substantially impaired his defense. Finally, Defendant argues that the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), prohibits the imposition of a mandatory minimum sentence absent a jury finding that Defendant had knowledge of the quantity of marijuana involved in the offense. We discuss each in turn.

## I.    Denial of Motion for New Trial

In general, "[w]e review the district court's decision to deny a motion for new trial . . . under an abuse of discretion standard." *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007).  The district court abuses its discretion "when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *Id.* (citing *United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003)).

There is a wrinkle where the motion for a new trial is based on an alleged *Brady* violation.  *United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010).  While we "review[] the denial of a motion for new trial based on *Brady* violations under an abuse of discretion standard[,] . . . . the district court's determination as to the existence of a *Brady* violation is reviewed *de novo*."  *Id.* (quoting *United States v. Graham*, 484 F.3d 413, 416 (6th Cir. 2007)). In other words, we give considerable deference to the district court's factual findings and factual conclusions, but we review *de novo* the district court's conclusions about the legal significance of those findings.

### A.    *Brady* Claims

In his motion for a new trial, Defendant argued that the memorandum from Special Agent Robert DeRocher "contains information which would have provided valuable impeachment which should have been disclosed to the defense under *Brady/Giglio*."   (R. 340, at 7.) Specifically, Defendant alleged that the prosecution withheld three pieces of information that weaken the credibility of the prosecution's key witness, Jon Abbott: 1) Abbott accused a third person of committing arson; 2) Abbott falsely claimed that DeRocher offered him immunity; and 3) Abbott had aggressively pursued immunity and protection from the prosecution.  On appeal, Defendant argues that the district court abused its discretion in rejecting his claim.  We find that the district court correctly analyzed each of Defendant's alleged *Brady* violations.

To establish a "true *Brady* violation," Defendant carries the burden of showing: 1) that the government suppressed evidence, either willfully or inadvertently; 2) that such evidence was favorable to the defense, either because it is exculpatory or because it is impeaching; and 3) that the suppressed evidence was material (*i.e.,* that prejudice ensued).  *White,* 492 F.3d at 410 (citing

*Strickler v. Greene,* 527 U.S. 263, 281–82 (1999)).  A deprivation of due process occurs where all three elements are present.  *Id*.

With regard to the last element, the Supreme Court has instructed that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (holding that the "touchstone of materiality is a 'reasonable probability' of a different result").  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Strickler*, 527 U.S. at 289–90 (quoting *Kyles*, 514 U.S. at 434).  In determining whether undisclosed evidence is material, we consider the suppressed evidence "collectively, rather than item-by-item," to decide whether its suppression undermines confidence in the verdict such that reversal is necessary.  *Warshak*, 631 F.3d at 300 (quoting *Schledwitz v. United States,* 169 F.3d 1003, 1012 (6th Cir. 1999)).

### 1.  *Arson Accusation*

The district court did not abuse its discretion in deciding that suppression of Abbott's statement accusing a third person of committing arson does not constitute a *Brady* violation.  The district court rejected Defendant's *Brady* claim after finding that Abbott's accusation was neither false nor contradicted, and thus "does not impeach [Abbott's] testimony."  *Dado*, 2013 WL 183997 at *9.  Defendant argues that the district court clearly erred in determining that Abbott's statement "has [not] been shown to be false," and seeks to prove that the accusation "*must have been false*" because the Michigan Fire Marshal had no record of a fire at any address associated with the individual.

Defendant's argument relies on the assumption that *all* fires, whether arson is suspected or not, are reported to the fire marshal, who in turn retains a file of the incident.  Notwithstanding the fact that Michigan law requires local fire officials to report all fires resulting in loss of life or property to the state Bureau of Fire Services, the absence of a file in the office of the fire marshal does not definitively disprove Abbott's accusation.  Moreover, the fire marshal "remembered

conducting a fire investigation relating to the person and place at issue" and remembered some details of the case. *Dado*, 2013 WL 183997 at *9.

The district court found that, "Abbott's accusation was never contradicted, indeed was later supported," and had not been shown to be false. *Dado*, 2013 WL 183997 at *9. We will not disturb a district court's factual findings unless we are left with the "definite and firm conviction that a mistake has been made." *Sawyer v. Whitley*, 505 U.S. 333, n.14 (1992). This is not such a case.

### 2. *False Claim of Immunity*

Similarly, the district court did not abuse its discretion in determining that Abbott's false statement that DeRocher had promised him immunity was not *Brady* material. In analyzing this claim, the district court properly applied the law of *Brady*, and found that Defendant could not demonstrate the requisite prejudice:

> While Abbott's false claim could have impeached his credibility at trial, the inclusion of that evidence would not have led [to a] different result. It has not been shown that Abbott lied about his involvement with Defendant; his only falsehood concerns whether or not he was promised immunity for testifying. Because Abbott's testimony concerning the material issues of the case— Defendant's involvement with the marijuana conspiracy—were adequately and consistently corroborated at trial and during the latter hearing, it cannot be said the suppression of this peripheral evidence prejudiced Defendant.

*Dado*, 2013 WL 183997 at *10.

On appeal, Defendant challenges the district court's characterization of Abbott's statement as "peripheral," arguing that evidence that Abbott had lied to the authorities "could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict." *United States v. Emor*, 573 F.3d 778, 782 (D.C. Cir. 2009). Defendant says little to dispute the district court's finding that Abbott's testimony concerning the material issues was adequately corroborated. Defendant merely observes, "Abbott . . . was the *only* person giving testimony who claimed personal knowledge of [Defendant's] involvement in the events which led up to the discovery of the marijuana and

arrest of the several participants. His testimony, and his credibility, were therefore of unique importance."

The district court's assessment of the evidence in the record was not clearly erroneous; in fact, it was correct. Abbott's testimony regarding Defendant's participation in the charged offenses was corroborated by the testimony of Rocky Corlew, Cory Corlew, Eric Schweikert, and Richard Anderson. Such evidentiary corroboration gives rise to confidence in the verdict. Accordingly, the suppressed statement was not *Brady* material, and the district court did not err in concluding that no *Brady* violation occurred.

### 3.   *Pursuit of Immunity*

Likewise, the district court did not err in finding that the government's failure to disclose Abbott's repeated requests for immunity does not constitute a *Brady* violation. The district court found that "[t]he additional impeachment concerning Abbott repeatedly requesting immunity and protection, even doggedly doing so, would not have changed this trial's result, and as such, is not material." *Dado*, 2013 WL 183997 at *10. Specifically, the court found that the withheld information was not material because it "would only have been useful to illustrate [Abbott's] bias for testifying," and "this avenue was explored" by defense counsel at Abbott's cross-examination such that further inquiry regarding Abbott's pursuit of immunity would have been cumulative.[3] *Id.* On appeal, Defendant challenges the district court's finding that that the

---

[3]During the trial, defense counsel cross-examined Abbott about his hope of leniency:

> Q. Okay. You did get arrested at least twice in connection with marijuana?
> A. Yes, I have.
> Q. Once was in 2009, is that correct?
> A. I believe so.
> Q. And the other was in December of last year?
> A. Yes.
> Q. And those were both marijuana-related transactions or cases?
> A. Yes.
> Q. At this point, have any formal charges been filed?
> A. I don't believe so. I think they are still pending further investigation.
> Q. Are those in state court?
> A. Yes.
> Q. And you're hoping that by providing truthful testimony, that will be taken into consideration by the state authorities in the handling of your cases?
> A. Yes, I am.

evidence would have been cumulative, and argues that the district court "misapprehended the potential impact of the withheld information." We find that the the district court did not err in finding that the suppressed evidence was not material.

First, the district court did not clearly err in determining that the evidence was cumulative. The district judge found that "[d]efense counsel attacked Abbott's motive for testifying by establishing he exchanged his testimony, in part, for something that he hoped for. Abbott's requests for immunity [from federal prosecution] are no different." *Dado*, 2013 WL 183997 at \*10. This characterization of the evidence is not clearly erroneous.

Second, as the district court concluded in considering Defendant's other *Brady* claim, *supra* at 10–11, "Abbott's testimony concerning the material issues of the case—Defendant's involvement with the marijuana conspiracy—were adequately and consistently corroborated at trial and during the latter hearing." *Dado*, 2013 WL 183997 at \*10. The government's case against Defendant did not rely exclusively on Abbott's testimony such that evidence casting doubt on Abbott's credibility would undermine our confidence in the verdict. Abbott's testimony regarding Defendant's participation in the charged offenses was independently corroborated by the testimony of numerous other witnesses and circumstantial evidence. Therefore, we cannot say that the suppressed evidence was material, or that a *Brady* violation occurred.

### 4. *Collective Impact*

Finally, the district court did not err in finding that the suppressed evidence, considered collectively, did not give rise to a *Brady* violation. After expressly acknowledging its obligation to consider the effect of the suppressed evidence collectively in assessing *Brady* materiality, the district court found that Defendant had not demonstrated prejudice because "Abbott was cross-examined concerning his bias to testify in the case," and "[Abbott's] testimony concerning

---

Defense counsel also ended Abbott's cross-examination with the following exchange:

Q: Okay. And in fact, you were to cooperate in this case or let's say the case up north, is that a fair statement?
A: I - I guess so.
Q: And the case that you say that is still under investigation, you hope that will go away based upon your cooperation in this case, is that a fair statement?
A: Yes.

Defendant's financial contributions to the marijuana operation, and later receipt of processed marijuana, were corroborated by other witnesses throughout trial." *Dado*, 2013 WL 183997 at *11. On appeal, Defendant contends that the district court "failed to give adequate weight to the impact of the information withheld in the case before it," and argues that "[t]he trial judge's comments regarding corroboration are unfounded" since Abbott was "the only witness who claimed personal knowledge" of Defendant's involvement with the marijuana growing operation.

Initially, this claim must fail because Defendant has not alleged that the district court relied on clearly erroneous findings of fact, used an erroneous legal standard, or improperly applied the law, *see White*, 492 F.3d at 408; rather, Defendant merely restates the argument he presented before the district court and challenges the outcome of the district court's analysis. Such an argument cannot surmount our deferential standard of review.

Moreover, we agree with the district court's conclusion that Defendant has not established that he suffered a *Brady* violation. Even if the jury had heard additional evidence that cast doubt Abbott's credibility, it is highly unlikely that this evidence would have changed the verdict in this case. Numerous witnesses corroborated Abbott's testimony, which bolstered its reliability and credibility. Evidence that Abbott lied during his aggressive pursuit of immunity and accused a third person of arson would have done little to shake the jury's confidence in Abbott's testimony, especially where Abbott had already been cross-examined about his desire for leniency from state prosecutors in exchange for his testimony.

Accordingly, the district court did not abuse its discretion in denying Defendant's motion for a new trial on the grounds of any alleged *Brady* violation.

### B.    Ineffective Assistance Claims

The district court also exercised sound discretion in rejecting Defendant's ineffective assistance of counsel claims. As explained above, a district court abuses its discretion only by relying on clearly erroneous findings of fact, using an erroneous legal standard, or improperly applying the law. *White*, 492 F.3d at 408; *see also United States v. Seago*, 930 F.2d 482, 488–89 (6th Cir. 1991) (applying abuse of discretion standard to ineffective assistance of counsel claim made in context of motion for a new trial.).

Under *Strickland* and its progeny, Defendant must first establish that counsel's performance was deficient, and second, that Defendant was prejudiced by the substandard performance.  466 US 668; *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  To satisfy the first prong of *Strickland*, Defendant must prove that counsel's representation was not merely below average, but rather that it "fell below an objective standard of reasonableness."  466 U.S. at 688.  We employ a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  In assessing deficiency, we "must take care to avoid 'second-guessing' strategic decisions that failed to bear fruit."  *Lundgren v. Mitchell*, 440 F.3d 754, 769–70 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689).

To satisfy the second prong of *Strickland*, Defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different."  466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  When assessing prejudice, a court "must consider the totality of the evidence before the judge or jury . . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695–96.  In addition, the court must consider the cumulative effect of the alleged errors, since "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hughes*, 505 F.3d 578, 597 (6th Cir. 2007) (quoting *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir. 1983)). Thus, examining an ineffective assistance of counsel claim requires the court to consider "the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case." *Lundgren*, 440 F.3d at 770.

In his motion for a new trial, Defendant argued that his retained trial counsel fell below the constitutionally-acceptable standard by: 1) failing to call a witness whose testimony would have been helpful to the defense; (2) failing to object to "inadmissible and unfairly prejudicial" evidence; and (3) opening the door to unfairly prejudicial opinion testimony.

1.  *Failure to call Defendant's cousin as a witness*

The district court did not abuse its discretion in rejecting Defendant's argument that counsel's failure to call Defendant's cousin as a witness constituted ineffective assistance of counsel.  Defendant's cousin, Kenneth Dado, was an employee of the Liquor Cave, where Defendant was arrested.  Kenneth was prepared to testify that the gun recovered during the officers' search of the liquor store belonged to him and was registered to him; that the marijuana found at the store was legally possessed by him under the Michigan Medical Marijuana Act; and that the scale which was found at the store also belonged to him.  Kenneth conveyed this information to Defendant's trial counsel, and expected to be called as a witness for the defense, but never was.

The district judge heard testimony from Defendant's trial attorneys at the evidentiary hearing on Defendant's motion for a new trial.  At the hearing, one of Defendant's trial counselors testified that he decided not to call Kenneth as a witness because "he was related to [Defendant], he worked with [Defendant] and he was growing marijuana in his basement." (R. 366, Transcript II at 97–98.)  He explained, "[h]ad [Defendant] been charged with something like felon in possession of a firearm, then that would have tipped the scales more in favor of putting Kenny Dado on the stand.  That would have been a strong defense to a gun charge." (*Id*. at 98.)  The district court made the following factual findings:

> Defendant's trial counsel, Christopher McGrath, interviewed Kenneth Dado before trial.  Mr. McGrath and Kenneth Scott, Defendant's other attorney, considered calling Kenneth Dado to testify, but reasoned the ample opportunity for cross-examination that would be extended to the government outweighed the positive results his testimony would bring.  Counsel also discussed the possibility of presenting witnesses with Defendant before the close of evidence and had frequent discussions about which witnesses to call.

*Dado*, 2013 WL 83997 at *14.

In rejecting Defendant's ineffective assistance claim, the district court explained that Defendant's counsel had fulfilled their basic duties by investigating the witness, and their decision not to call Kenneth Dado was a strategic one.  The district court also emphasized the fact that Kenneth Dado's testimony claiming ownership of the gun would not exculpate

Defendant, since it was not directly related to the charged offenses.  The district court concluded that trial counsel's failure to call Defendant's cousin Kenneth Dado as a witness was a strategic decision that did not violate Defendant's right to effective representation.

On appeal, Defendant does not allege that the district judge relied on clearly erroneous findings of fact, used an erroneous legal standard, or improperly applied the law.  Rather, Defendant contends that the district court's "analysis ignores the fact that, whether charged or not, the gun was a significant factor in the case against [Defendant]," and reiterates his argument that "reasonable trial strategy called for heightened sensibility to the impact of proofs which might, in a different case, be of only marginal significance."

The district court made reasonable factual findings, and properly applied *Strickland* in assessing Defendant's claims.  Defendant cannot prevail with this argument on appeal because the district judge was well within his discretion to find that the decision not to call Kenneth Dado as a witness was a strategic decision, and that Kenneth's testimony "is not the type of evidence that would raise reasonable doubts as to Defendant's guilt in this case." *Dado*, 2013 WL 183997 at *14.

### 2.  *Failure to object to witness testimony*

Similarly, the district court correctly concluded that trial counsel's failure to object to questionably admitted testimony from Richard Anderson and DEA Special Agent Chris Scott did not amount to ineffective assistance of counsel.

#### a.  Richard Anderson

In his motion for a new trial, Defendant argued that counsel's failure to object to hearsay evidence offered by Richard Anderson, a marijuana grower who met and talked to both Rocky Corlew and Michael Szemites in the Clare County Jail following their arrest in this case, deprived Defendant of effective representation.  At trial, Anderson told the jury about a conversation he had with Corlew and Szemites regarding Defendant's role in the marijuana manufacturing operation.[4]  The district court found that counsel's failure to object to Anderson's

---

[4]Anderson testified at trial that Rocky Corlew and Michael Szemites told him that "they had a guy that bought quite a bit of [marijuana], for $3,000 a pound. . . .  They said he owned stores in Flint. I think it was liquor

testimony was neither deficient nor prejudicial because the testimony was admissible under Federal Rule of Evidence 801(d)(1)(B) as a prior consistent statement of Rocky Corlew. The district judge then went on to explain that, even if the evidence were inadmissible, counsel's failure to object would not constitute ineffective assistance because "three different witnesses had already testified Rocky and Szemites planned to sell marijuana, at \$3,000 a pound, to a buyer who owned liquor stores," and Defendant therefore could not show that Anderson's testimony was prejudicial.

On appeal, Defendant offers a weak challenge in response to the district court's finding that the evidence was properly admitted: "In defendant's view [the district court's finding that Anderson's testimony was properly admitted under Rule 801(d)(1)(B)] is a doubtful proposition at best, but whatever its merits, it overlooks the central assertion of prejudice." Defendant focuses instead on whether or not the evidence was prejudicial. Defendant insists that "[t]he trial judge's analysis [of prejudice] was overly constricted, and failed to give fair compass to the claims actually before him."

As the district court correctly acknowledged, "[i]f evidence admitted without objection was admissible, then the complained of action fails both prongs of the *Strickland* test." *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001). Moreover, to succeed in a *Strickland* claim, Defendant must prove both deficiency *and* prejudice—not simply one or the other. The district court clearly explained that Defendant could not show prejudice regarding Anderson's testimony, in light of the testimony of three other witnesses. The district court did not abuse its discretion in denying a new trial on this ground.

### b.  DEA Special Agent Chris Scott

Defendant also argued that trial counsel was constitutionally ineffective for failing to object to DEA Special Agent Chris Scott's testimony regarding the way in which "the top guys" in drug operations distance themselves from the people actually conducting them. The district court found that counsel's failure to object to Scott's testimony was neither deficient nor prejudicial because the testimony was admissible under Federal Rule of Evidence 702, which

---

stores. They didn't say his name or describe what he looked like or anything." The government also introduced a letter that Anderson wrote to his attorney about the conversations he had with Corlew and Szemites.

provides that "a person with 'specialized knowledge' qualified by his or her 'knowledge, skill, experience, training, or education' may give opinion testimony if it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Dado*, 2013 WL 183997, at *17 (quoting *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007)). The district court quoted *Johnson* for the proposition that "[c]ourts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable" and that the Sixth Circuit "regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the understanding of the average layman." 488 F.3d at 698. (quoting *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004)). The court found that Scott's testimony was properly tailored to the evidence presented during the trial and coupled with an appropriate jury instruction. The district judge added, "[f]urther, if the evidence was in fact admissible, it fails the *Strickland* test outright." Dado, 2013 WL 183997, at *15. On appeal, Defendant argues that the district court "hewed to an inappropriate legal standard," since "*Johnson* was a 'plain error' case, in which the Court merely held that the admission of an agent's opinion testimony, without objection, did not transgress that rigorous standard."

Even if the district court erred in determining that Scott's testimony was admissible under Rule 702, Defendant still cannot show that the district court abused its discretion in denying Defendant's motion for a new trial. Concerning the failure to object to inadmissible evidence, "the Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Lundgren*, 440 F.3d at 774 (quoting *Engle v. Isaac,* 456 U.S. 107, 134 (1982)). "Learned counsel . . . use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state." *Lundgren*, 440 F.3d at 774. Defendant argues that *Lundgren* is inapplicable because this was not a "single failure to object" but rather a series of failures to object. Even considered collectively, the sum of the "improperly admitted" evidence was not so prejudicial that it defaulted the case to the state. Whether or not the evidence from either witness was admissible, the district court did not err in determining that it was not prejudicial such that a new trial was warranted. Therefore, reversal is not warranted on this ground.

### 3. *"Opening the door" to inadmissible "other acts" evidence*

Likewise, the district court did not abuse its discretion in concluding that trial counsel's cross-examination of Cory Corlew was not deficient or prejudicial such that reversal was required. On cross-examination, defense counsel attempted to undermine Cory's testimony about Defendant's involvement with the grow operation by showing that she and Rocky had only attenuated contact with Defendant. In the course of that examination, defense counsel asked Cory to enumerate every time she had met Defendant. The district court ruled that this line of questioning opened the door for the government to elicit testimony about an incident Cory observed in 2004, in which Defendant brought a hockey bag containing marijuana to Rocky Corlew and Michael Szemites, which the court had previously ruled inadmissible on direct examination. In his post-verdict motion for a new trial, Defendant argued that this constituted ineffective assistance of counsel. The district court rejected Defendant's argument, finding that "counsel's attempt to undermine Defendant's involvement in this way was a legitimate objective for cross-examination accompanied by a reasonable strategic risk." *Dado*, 2013 WL 183997 at *19. The court found that "[t]here was ample evidence throughout the trial that Defendant was involved with drug trafficking at one time or another," and distinguished the facts of Defendant's case from that of *White v. Thaler*, 610 F.3d 890 (5th Cir. 2010), a case in which "counsel's failure opened the door to evidence that was used to crush the defendant's case." *Dado*, 2013 WL 183997 at *19.

On appeal, Defendant once again argues that the evidence was unfairly prejudicial, and is demonstrative of the constitutionally deficient representation Defendant received. But in doing so, Defendant essentially concedes that counsel's questioning was a strategic decision. *See* Appellant Br. at 39 ("[D]efense counsel then proceeded to cross-examine her about her lack of prior contact with the defendant, apparently calculated to suggest that she had no basis to believe that he was in fact involved in the marijuana growing venture."). In assessing deficient performance, we "must take care to avoid 'second-guessing' strategic decisions that failed to bear fruit." *Lundgren*, 440 F.3d at 769–70 (quoting *Strickland*, 466 U.S. at 689). As the district court explained, and as Defendant apparently concedes, this was a strategic decision by trial counsel. Thus, Defendant cannot succeed on this claim.

4.  *Cumulative effect*

Finally, Defendant argues that the district court erred in concluding that the collective impact of trial counsel's errors did not surmount the high standard for proving ineffective assistance of counsel under *Strickland.*  But Defendant does not allege that the district court relied on clearly erroneous findings of fact, used an erroneous legal standard, or improperly applied the law.  Rather, Defendant's argument on appeal is, fundamentally, little more than his disagreement with the conclusions reached by the district court.  Defendant has not shown that the district court abused its discretion in denying his motion for a new trial.

## II.     Jury Instruction

Prior to trial, Defendant requested the following jury instruction:

The existence of a buyer-seller relationship between a defendant and another person, without more, is not sufficient to establish a conspiracy, even where the buyer intends to resell marijuana. The fact that a defendant may have bought marijuana from another person or sold marijuana to another person is not sufficient without more to establish that the defendant was a member of the charged conspiracy or to establish that the defendant aided and abetted in manufacturing in marijuana.[5]

---

[5]The instruction submitted by Defendant was a slightly modified form of the first paragraph of the pre-2012 version of a Seventh Circuit Pattern Jury which read in full as follows:

The existence of a simple buyer-seller relationship between a defendant and another person, without more, is not sufficient to establish a conspiracy, even where the buyer intends to resell [name the goods.] The fact that a defendant may have bought [name of goods] from another person or sold [name of goods] to another person is not sufficient without more to establish that the defendant was a member of the charged conspiracy.

In considering whether a conspiracy or a simple buyer-seller relationship existed, you should consider all of the evidence, including the following factors:

(1) Whether the transaction involved large quantities of [name of goods];
(2) Whether the parties had a standardized way of doing business over time;
(3) Whether the sales were on credit or on consignment;
(4) Whether the parties had a continuing relationship;
(5) Whether the seller had a financial stake in a resale by the buyer;
(6) Whether the parties had an understanding that the [name of goods] would be resold.

No single factor necessarily indicates by itself that a defendant was or was not engaged in a simple buyer-seller relationship.

Seventh Circuit Pattern Jury Instruction 6.12 (1999).

The government opposed this request, arguing that the proposed instruction is both inconsistent with Sixth Circuit authority and inapplicable to Defendant's case. The district court ultimately declined to deliver the proposed instruction. On appeal, Defendant challenges the district court's refusal to deliver the proposed instruction, and insists that this error necessitates a new trial. Because Defendant was not given an adequate opportunity to object to the district court's failure to give the requested instruction, Rule 30(d) of the Federal Rules of Criminal Procedure does not preclude our review of the issue on appeal. We review the district court's decision to deny the jury instruction request for an abuse of discretion. *See Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 305–06 (6th Cir. 2011).

We review jury instructions "as a whole to determine whether they fairly and adequately present the issues and applicable law to aid the jury in making its determination." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 880–81 (6th Cir. 2007). A district court's refusal to deliver a requested instruction is reversible error only if the proposed instruction is "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005) (quotation marks and citation omitted).

Defendant's proposed jury instruction fails on all three grounds. Although it is true that Sixth Circuit case law recognizes that "a buyer-seller relationship alone is [generally] insufficient to tie a buyer to a conspiracy because mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy," *United States v. Dietz*, 577 F.3d 672, 680 (6th Cir. 2003), the omission of the word "mere" renders the proposed instruction an incomplete and inaccurate recitation of Sixth Circuit case law.[6] Moreover, the proposed instruction was substantially covered by the standard jury instructions regarding conspiracy and accomplice liability, which were delivered to the jury at Defendant's trial. Finally, the failure to deliver the proposed jury instruction did not substantially impair Defendant's defense. The evidence

---

[6]Defendant relies on a recent amendment to Seventh Circuit Pattern Jury Instruction 6.12 as evidence that his proposed jury instruction is a correct statement of Sixth Circuit law. In 2012, the Seventh Circuit amended their pattern jury instruction, omitting the word "simple" as well as the list of factors. Defendant cites this change as evidence that his proposed jury instruction is a correct statement of Sixth Circuit case law. However, Defendant cites no Sixth Circuit case law adopting or approving a similar instruction.

presented during trial revealed that Defendant was the financier of a very substantial marijuana manufacturing organization and the primary distributor of the marijuana produced by that organization, not a mere buyer or seller.  The inclusion of the buyer-seller jury instruction would not only have been unnecessary, but it likely would have been confusing to the jury.  Accordingly, Defendant cannot succeed with this argument on appeal.

### III.    *Mens Rea* **Requirement of 21 U.S.C. § 841(b)**

Lastly, Defendant argues that his sentence—the 20-year mandatory minimum required by 21 U.S.C. § 841(b)—must be vacated in light of the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013).  Because Defendant did not make this argument before the district court, we review it for plain error.  *See United States v. Mack*, 729 F.3d 594, 607 (6th Cir. 2013).  Under this standard, Defendant must show that the district court (1) committed an error, (2) that the error was plain, and (3) the error affects Defendant's substantial rights.  *See Johnson v. United States*, 520 U.S. 461, 467 (1997).  "If these three conditions are met, then we may exercise our discretion to notice the forfeited error, but only if we find the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  *Mack*, 729 F.3d 607.

Section 841(b) prescribes the punishments district courts must impose on defendants convicted of manufacturing a controlled substance (among other offenses).  As relevant to this case, § 841(b) mandates a 20-year minimum sentence if two requirements are satisfied: (1) a defendant's offense "involv[es] . . . 1,000 or more marihuana plants," and (2) the defendant "commits such a violation after a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(A).  This Court has previously held that "the government need not prove *mens rea* as to the type and quantity of the drugs in order to establish a violation of § 841(b)." *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003).  In other words, the first prong of § 841(b) is a strict liability requirement—even if Defendant did not know that his offense involved 1,000 or more marijuana plants, he can be subject to the mandatory minimum triggered by that quantity of drugs.

Defendant accepts our precedent concerning § 841(b), but contends that our case law was effectively overruled by *Alleyne*.  Pursuant to *Alleyne*, Defendant argues, the government must

prove beyond a reasonable doubt that a defendant knew the quantity of drugs involved in the offense. Although we recognize the potential pitfalls of the strict liability punishment scheme imposed by § 841(b), we find nothing in *Alleyne* that mandates or permits us to overturn this Circuit's established interpretation of this section.

Prior to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), several Courts of Appeals held that § 841(b) imposed a strict liability punishment scheme based solely on the type and quantity of drugs possessed, and that a defendant's knowledge of the type and quantity is not relevant to sentencing. *See, e.g., United States v. Valencia-Gonzales*, 172 F.3d 344, 346 (5th Cir. 1999); *United States v. Strange*, 102 F.3d 356, 361 (8th Cir. 1996); *United States v. Salazar*, 5 F.3d 445, 446 (9th Cir. 1993); *United States v. McMahon*, 935 F.2d 397, 399–400 (1st Cir. 1991); *United States v. Collado-Gomez*, 834 F.2d 280, 281 (2d Cir. 1987). In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In the wake of *Apprendi*, defendants convicted under § 841 argued that drug quantity is an element of the offense for which a *mens rea* requirement applies. *See, e.g., United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001).

We swiftly rejected this argument. The *mens rea* the government must prove is established by § 841(a), "which requires nothing more specific than an intent to distribute a controlled substance." *Villarce*, 323 F.3d at 439. Drug type and quantity are irrelevant to this *mens rea* element. *See id.* *Apprendi* did not change the plain language of "the penalty provisions of § 841(b), which require only that the specified drug types and quantities be 'involved' in an offense." *United States v. Gunter*, 551 F.3d 472, 485 (6th Cir. 2009). Every other Court of Appeals that has considered this issue has reached the same conclusion. *See United States v. Branham*, 515 F.3d 1268, 1275–76 (D.C. Cir. 2008); *United States v. King*, 345 F.3d 149, 152–53 (2d Cir. 2003); *United States v. Brower*, 336 F.3d 274, 276–77 (4th Cir. 2003); *United States v. Gamez-Gonzalez*, 319 F.3d 695, 699–700 (5th Cir. 2003); *United States v. Carranza*, 289 F.3d 634, 644 (9th Cir. 2002); *United States v. Collazo-Aponte*, 281 F.3d 320, 326 (1st Cir. 2002); *United States v. Barbosa*, 271 F.3d 438, 458 (3d Cir. 2001); *United States v.*

*Carrera*, 259 F.3d 818, 830 (7th Cir. 2001); *United States v. Sheppard*, 219 F.3d 766, 768 n. 2 (8th Cir. 2000).

Even though we rejected Defendant's argument post-*Apprendi*, Defendant contends that *Alleyne* requires us to reverse course. In *Alleyne,* the Supreme Court extended the constitutional rule announced in *Apprendi* to facts that increase the statutory mandatory minimum sentence for a crime. As the Court succinctly reasoned, *Apprendi* held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 133 S. Ct. at 2155 (citation omitted).

Defendant posits, correctly, that drug quantity is an element of the offense in § 841, since its effect is to increase the maximum penalty. Thus the jury had to find—as it did—that Defendant's crime "involved" 1,000 or more marijuana plants. But Defendant goes a step farther. He asserts that after *Alleyne*, we must read § 841(a) and § 841(b) together, and that the "knowingly or intentionally" element of § 841(a) now applies equally to the "involved" element of § 841(b).

Defendant's argument confuses two distinct concepts—quantum of proof and *mens rea*. The Sixth Amendment mandates that the quantum of proof the government must satisfy in a criminal trial is "beyond a reasonable doubt," as opposed to a preponderance of the evidence, clear and convincing evidence, or some other standard. *Alleyne*, 133 S. Ct. at 2156. By contrast, the *mens rea* requirement is a creature of statute. To convict a defendant of a § 841(a) offense, the government must prove that the defendant committed the criminal act "knowingly or intentionally," as opposed to negligently or recklessly, for example. Following *Alleyne*, a jury must find beyond a reasonable doubt that Defendant's crime "involved" 1,000 or more marijuana plants. But *Alleyne* did not rewrite § 841(b) to add a new *mens rea* requirement. Under our precedent, § 841(b) still allows for strict liability as to the type and quantity of the drugs involved in a § 841(a) offense.

Defendant correctly notes that strict liability punishment schemes are strongly disfavored in criminal law, and points out the potential for anomalous results under the current reading of

§ 841.  Our Circuit has not resolved whether § 841(b) can survive a due process challenge and we do not reach that question today.  We simply conclude that *Alleyne* has not overruled our precedent construing § 841(b).  A jury found beyond a reasonable doubt that Defendant's offense involved 1,000 or more marijuana plants.  The jury did not need to find that Defendant knew that his offense involved this type or quantity of drugs.

## CONCLUSION

For the reasons set forth herein, we **AFFIRM** the convictions and sentence imposed by the district court**.**

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting.  The main argument against reading a *mens rea* requirement into section 841(b) is that section 841(a) already requires that a defendant "knowingly or intentionally" possess drugs.  Because section 841(a) "requires nothing more specific than an intent to distribute a controlled substance," *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003), and *supra* at 22-23, then "the drug quantity involved in appellant's offense is not a factor that is necessary to the determination of whether his conduct is 'criminal' or 'innocent,'" *United States v. Collazo-Aponte*, 281 F.3d 320, 326 (1st Cir. 2002), and *supra* at 23.  Thus, the argument goes, the drug quantities in section 841(b) are "irrelevant" to the violation of section 841(a) and vice versa:  "intent is irrelevant to the penalty provisions of § 841(b)."  *United States v. Gunter*, 551 F.3d 472, 484-85 (6th Cir. 2009); *supra* at 23.  The keystone of the argument is that sections 841(a) and (b) are totally unrelated when it comes to the defendant's guilt.

*Alleyne* removes this keystone.  The Supreme Court held that "the core crime and the fact triggering the mandatory minimum sentence"—here, the drug quantity—"together constitute a new, aggravated crime, each element of which must be submitted to the jury." *Alleyne v. United States*, 133 S.Ct. 2151, 2161 (2013).  The key word is "together"—sections 841(a) and (b) "together" create a "separate, aggravated" possession crime distinguishable from a violation of section 841(a) alone. *Id.* at 2162. The facts of drug possession and drug quantity are no longer irrelevant but totally dependent conditions, both necessary to prove the crime alleged here.

Why then, is intent relevant to one but not the other?  The Supreme Court has recognized that "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009).  This observation reflects the "ordinary English usage" of the word "knowingly." *Id.*  For example, "[i]f a child knowingly takes a toy that belongs to his sibling, we assume that the child not only knows that he is taking something, but that he also knows that what he is taking is a toy *and* that the toy belongs to his sibling." *Id.* at 651

(emphasis in original).  If the government alleges that Dado knowingly manufactured over 1000 marijuana plants, ordinary usage suggests that the government should have to prove not only that Dado knew he was manufacturing something, but also that he knew he was manufacturing over 1000 plants of marijuana.

This interpretation respects the core lesson of the *Apprendi* and *Alleyne* cases, which is that "every fact which is in law essential to the punishment sought to be inflicted" is an inseparable "element" of the crime.  *Alleyne*, 133 S. Ct. at 2159 (internal edit omitted).  When interpreting the requirements of a crime, "the relevant inquiry is one not of form, but of effect," *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000), and the effect of isolating the intent required to commit Dado's crime—the intent to manufacture some amount of some substance rather than the intent to manufacture over 1000 marijuana plants—is to totally separate Dado's act from the facts relevant to his punishment.

This reasoning makes even more sense with regard to Dado's conspiracy charge.  Even before *Apprendi* and *Alleyne*, our Circuit required the district court to "make *particularized* findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for" the quantity of drugs involved in the entire conspiracy.  *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphasis in original); *cf. United States v. Kennedy*, 714 F.3d 951, 961 (6th Cir. 2013) (applying *Campbell*).  To apply section 841(b) otherwise would "expose defendants to being sentenced on conspiracies whose activities they did not agree to jointly undertake and could not foresee," and such "overbroad" or "dragnet" conspiracies must be avoided.  *Campbell*, 279 F.3d at 400 (citing *Anderson v. United States*, 417 U.S. 211, 224 (1974)); *see also United States v. Martinez*, 987 F.2d 920, 926 (2d Cir. 1993) ("We find that Congress did not intend to . . . require strict liability in any case where an individual small-time dealer becomes associated with a large-scale conspiracy.")  If the defendant's knowledge as to the amount of drugs involved in a conspiracy was relevant to judge's application of section 841(b), it makes no sense to hold that such knowledge is irrelevant to a jury's application of the section.

Important principles are also at play here.  The majority's rule runs against the strong presumption against strict liability crimes.  *Staples v. United States*, 511 U.S. 600, 607 n.3

(1994); *supra* at 24. The majority's opinion disregards the presumption that the more serious the penalty at issue, the more important intent is to guilt. *Staples*, 511 U.S. at 616; *supra* at 24. In Dado's case, he is facing two mandatory minimum sentences of 20 years triggered by a fact that he did not necessarily even know about. If the measure of *mens rea* is that it "require[s] that the defendant know the facts that make his conduct illegal," *Staples*, 511 U.S. at 605, then Dado's knowledge of the amount of drugs involved in his crime is a necessary condition for his guilt and the application of the mandatory minimum sentences in this case.

Although the majority say that they are just following precedent, the influence of the *Alleyne* case on the *mens rea* required in section 841(b) is an issue of first impression before this Court. I agree with the majority's view that longstanding principles of criminal law favor including a *mens rea* requirement in 841(b) and vacating Dado's convictions in this case. *Supra* at 24. Yet the majority binds its own hands, "find[ing] nothing in *Alleyne* that mandates or permits us to overturn this Circuit's established interpretation of" section 841(b). *Supra* at 22. For the reasons above, I cannot agree with the majority's conclusion. I respectfully dissent.

In addition, I note in passing that the defendant was sentenced to an absurdly long mandatory sentence of 20 years imprisonment for growing marijuana plants. In a legal system that has historically strongly disfavored criminal strict liability and has favored requiring *mens rea* or knowledge of the crime, we should not hesitate to insist that the prosecutor prove a defendant's knowledge of the scope of the conspiracy. We should take into account that a number of states have now legalized growing marijuana plants for both medicinal and recreational use. This change in attitude toward the crime should lead us to try to avoid such excessive sentences that have now filled the jails of the country with drug offenders, particularly the federal prisons. If the criminal division of the Department of Justice cannot desist from asking for such long sentences, and continues its policy of insisting on excessive drug sentences, the courts should at least follow a consistent policy of requiring knowledge of the elements of the crime.