RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

           *Plaintiff-Appellee*,

    *v.*

JOHNNY WILLIAMS (18-6343); JONATHAN BARRETT
(19-5745); JOEDON BRADLEY (19-5764),

           *Defendants-Appellants*.

> Nos. 18-6343/19-5745/5764

────────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cr-00176-4—Jack Zouhary, District Judge.

Argued:  November 18-2020

Decided and Filed:  May 26, 2021

Before:  COLE, DONALD, and READLER, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:**  Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant in 18-6343.  Michael E. Terry, TERRY & GORE, Nashville, Tennessee, for Appellant in 19-5745. Matthew M. Robinson, ROBINSON & BRANDT, PSC, Covington, Kentucky, for Appellant in 19-5764.  Amanda J. Klopf, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant in 18-6343.  Michael E. Terry, Stephanie H. Gore, TERRY & GORE, Nashville, Tennessee, for Appellant in 19-5745.  Matthew M. Robinson, ROBINSON & BRANDT, PSC, Covington, Kentucky, for Appellant in 19-5764.  Amanda J. Klopf, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

BERNICE BOUIE DONALD, Circuit Judge.   Johnny Williams, Jonathan Barrett, and Joedon Bradley (collectively, "the defendants") were indicted for conspiring with each other and six other individuals to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846.  Each defendant was also charged with multiple counts of distributing and possessing with the intent to distribute fentanyl, the use of which resulted in serious bodily injury or death, in violation of § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.  A jury found the defendants guilty on all counts.   Each defendant filed a separate appeal, which this Court consolidated.   The defendants challenge the sufficiency of the evidence as to their convictions and the district court's denial of pre-trial motions.  For the reasons set forth below, we **AFFIRM** the convictions as to all three defendants.

**I.**

In May 2016, the Drug Enforcement Administration ("DEA") was investigating the distribution of counterfeit prescription pills in Florida, Kentucky, and Tennessee.  The DEA raided the home of Eric Falkowski—the primary target of the investigation—and found tableting machines, bags of powders, and dyes.  Soon thereafter, Joedon Bradley approached Falkowski, wanting to move Falkowski's drug business to Tennessee.   Once in Madison, Tennessee, Falkowski and Bradley pressed thousands of pills containing a mixture of alprazolam, acetaminophen, and fentanyl.  The white pills were marked with an "A333" stamp and looked nearly identical to Percocet pills.

On July 5, 2016, a large quantity of those counterfeit pills was distributed in Murfreesboro, Tennessee.  On July 6, law enforcement and emergency medical personnel attended to several victims who overdosed on the counterfeit pills, which the victims thought were 10 mg Percocet pills.  One individual died from the overdose, while seven other individuals had to be hospitalized.  An investigation revealed that Jennifer Dogonski had brokered an agreement between Johnny Williams and Jonathan Barrett for the purchase of 150 pills.

On July 7, law enforcement then executed a search warrant for Barrett's home, where it found approximately 70 Xanax pills, but not the counterfeit pills. Law enforcement arrested Barrett and took him to the Murfreesboro Police Department ("MPD"), where law enforcement interrogated him and had him sign a written statement about his conduct before releasing him. Barrett then returned to the MPD days later for another recorded interrogation. During this second interrogation, on July 11, Barrett explained that he had purchased, and later distributed, 150 counterfeit Percocet pills in a deal Dogonski brokered between Williams and him. Barrett also acknowledged that he had traded the last of his counterfeit pills for the Xanax pills found in his home with the overdose victim who died.

Law enforcement also interrogated Johnny Williams on July 7, 2016. During the interrogation, Williams decided to terminate questioning. The officers released Williams but, on his way out, they convinced him to come back to finish the interview. They read him his *Miranda* rights and Williams signed a waiver. During the interview, Williams stated that he received a call from Dogonski, who asked Williams if he had any oxycodone or Percocet pills. Williams admitted that he sold Dogonski the counterfeit Percocet pills, which he had obtained from "Bo." Following the interview, Williams was allowed to leave, but law enforcement seized his cell phone on the belief that it contained evidence of criminal activity. Four hours later, the officers obtained and executed a search warrant on the phone, where they discovered that Williams had exchanged text messages with Dogonski about the sale of the pills. Based on the information recovered from the search of his cell phone, a search warrant was later issued for Williams' apartment.

Law enforcement identified Davi Valles, Jr. as "Bo." Valles had purchased approximately 400 of the counterfeit pills from Preston Davis. Davis later admitted to manufacturing the pills with Falkowski and Bradley. In executing a search warrant at Davis' home, law enforcement found fentanyl, a pill press, and a pill die stamped with "A333." Law enforcement also searched Falkowski's phone and found text messages between him and Bradley discussing the manufacture and distribution of the pills. On December 22, 2016, law enforcement arrested Bradley. Once handcuffed, he admitted his involvement in manufacturing and distributing the pills with Falkowski.

On May 10, 2017, a federal grand jury issued a 10-count indictment, charging the defendants with crimes related to the distribution of fentanyl.  Davis and Dogonski were each charged separately and made plea deals with the government.  Between the Fourth and Fifth Superseding indictments, Falkowski, Valles, and LaKrista Knowles (a mid-level distributor) were removed as defendants after making plea deals with the government. Bradley was added to all nine substantive counts under an aiding-and-abetting theory.  The remaining four defendants (Bradley, Barrett, Williams, and Jason Moss) were charged with one count of conspiracy to distribute and possess with intent to distribute a mixture or substance containing a detectible amount of fentanyl under 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846; and eight counts of distribution of a substance containing a detectible amount of fentanyl, the use of which resulted in serious bodily injury or death, under 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. Counts Six and Ten listed only Bradley, although the government voluntarily dismissed Count Six before trial.

At trial, the government introduced the defendants' statements obtained during questioning, as well as testimony from law enforcement officers, medical examiners, and victims.  Based on the evidence presented at trial, the jury returned a verdict of guilty on all counts as to Bradley, Barrett, and Williams (but found Moss not guilty on all counts).  In doing so, the jury found that the pills were the but-for cause of the harm to the victims.  The district court then sentenced Williams to 240 months' imprisonment, Barrett to 276 months' imprisonment and Bradley to 360 months' imprisonment.  The defendants filed timely notices of appeal, and now raise several challenges to their convictions.

**II.**

Defendants raise several sufficiency-of-the-evidence challenges.  We address these challenges first to determine whether there can be a retrial.  *See United States v. Parkes*, 668 F.3d 295, 300 (6th Cir. 2012).

In sufficiency-of-the-evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).  It is the jury's job "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*  "[O]ur court on appeal will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and this rule applies whether the evidence is direct or wholly circumstantial." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984).

## A.  Existence of a Conspiracy (Count One)

All three defendants assert that there is insufficient evidence of a single conspiracy. Bradley and Barrett specifically argue that the evidence shows they only had a buyer–seller relationship with other defendants, but not an actual agreement.  Bradley further asserts that the evidence, at best, shows multiple conspiracies rather than a single conspiracy, resulting in a prejudicial variance from the indictment.

1. In order "[t]o sustain a conviction for drug conspiracy under section 846, the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007).  Conspiracy requires: "(1) An object to be accomplished[;] (2) [a] plan or scheme embodying means to accomplish that object[;] and (3) [a]n agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means." *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973).

An agreement can be tacit, not formal, and the "government may meet its burden of proof through circumstantial evidence." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999). "Generally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy because mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy." *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Cole*, 59 F. App'x 696, 699 (6th Cir. 2003)).  However, we have "often upheld conspiracy convictions where there was additional evidence, beyond the

mere purchase or sale," of a wider agreement. *Cole*, 59 F. App'x at 699–700. To that end, circumstantial evidence that may establish that "a drug sale is part of a larger drug conspiracy" includes advance planning, ongoing purchases or arrangements, large quantities of drugs, standardized transactions, an established method of payment, and trust between the buyer and seller. *Deitz*, 577 F.3d at 680–81 (citations omitted).

Here, the evidence is sufficient to show that a reasonable jury could find that all three defendants participated in a "chain" conspiracy to distribute controlled substances. In a chain conspiracy, "the agreement can be inferred from the interdependent nature of the criminal enterprise." *See United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989). And knowledge of the operation "may be inferred from the interrelated nature of the drug business or the volume of drugs involved." *Id.* The evidence demonstrated that Bradley, as the manufacturer of thousands of counterfeit pills, worked with other intermediaries to achieve a common goal of distributing controlled substances. The government also showed that Williams bought 300 pills from Valles, sold pills to Dogonski (for sale to others), and worked with Dogonski to sell 150 pills to Barrett. Based on the number of Williams' contacts within the chain, a reasonable juror could find that he knowingly agreed to participate in a larger scheme to violate drug laws. Likewise, Barrett, as an end distributor in the chain, bought counterfeit pills with the intent to distribute them to third parties (rather than use them personally). He communicated with Dogonski about the availability of Percocet, purchased pills from Williams with Dogonski's assistance, and sold pills to another distributor and several end-users who overdosed. Although Barrett may not have known individuals higher in the chain, it was reasonable for the jury to find that he participated in the conspiracy. *See United States v. Martinez*, 430 F.3d 317, 332–33 (6th Cir. 2005) ("In a drug distribution 'chain' conspiracy, it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every member, or was not involved in all the activities in furtherance of the conspiracy.").

2. Both Williams and Barrett argue that they could not have been part of the conspiracy because they did not know that the pills were counterfeit and thus contained fentanyl. They argue that because they did not know the object of the conspiracy—to distribute and possess with

intent to distribute a drug mixture *with fentanyl*—they did not have the knowledge necessary to be part of the conspiracy.

This argument is unpersuasive. We have repeatedly held that "the government need not 'prove mens rea as to the type and quantity of the drugs' in order to establish a violation of" §§ 841 and 846. *United States v. Villarce*, 323 F.3d 435, 439 & n.1 (6th Cir. 2003) (quoting *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001)).

> The *mens rea* the government must prove is established by § 841(a), which requires nothing more specific than an intent to distribute a controlled substance. Drug type and quantity are irrelevant to this *mens rea* element . . . . [T]he penalty provisions of § 841(b) . . . require only that the specified drug types and quantities be involved in an offense.

*United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014) (citations and internal quotation marks omitted). Most recently, we addressed whether the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 1291 (2019), abrogated this precedent and concluded that it did not. *See United States v. Mahaffey*, 983 F.3d 238, 242–45 (6th Cir. 2020). To be sure, knowledge and intent to join the conspiracy includes that the defendant "was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991). Therefore, we have "repeatedly held that participation in a scheme whose ultimate purpose a defendant does not know is insufficient to sustain a conspiracy conviction under 21 U.S.C. § 846." *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010) (collecting cases). But here, the ultimate purpose of the scheme was "to distribute and possess with intent to distribute counterfeit pills that contained fentanyl." Fifth Superseding Indictment, R. 256, PageID 661. And the government demonstrated that both defendants were aware that they were involved in distributing and possessing with intent to distribute counterfeit pills, which happened to "contain[] fentanyl." A reasonable juror could therefore conclude that Williams and Barrett knowingly joined this conspiracy.

3. Barrett cites *United States v. Wheat*, 988 F.3d 299 (6th Cir. 2021), for the proposition that he was merely a buyer and should not have been charged in the conspiracy. However, *Wheat* is distinguishable from this case. In *Wheat*, the defendant had a single meeting with a person named Reels and provided Reels with a free sample of heroin. *Id.* at 305. Reels decided

not to purchase any heroin and the two went their separate ways. *Id.* We therefore found that the evidence was insufficient to charge the defendant with a drug conspiracy. *Id.* We explained that "mere negotiations between drug traffickers will not suffice; the conspirators must actually agree to accomplish an illegal objective or accede to illegal terms that are acceptable to both." *Id.* at 307 (quoting *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984)). This is not the case here, because Barrett purchased counterfeit Percocet pills for distribution. And as explained above, even if he did not know they were laced with fentanyl specifically, he was aware that he was purchasing controlled substances. *See Villarce*, 323 F.3d at 439 & n.1. Furthermore, in *Wheat*, the government "did not charge the defendant with distributing to Reels; it charged him with *conspiring* with Reels." *Id.* at 309 (emphasis added). Based on that inchoate offense alone, we found that providing Reels with a sample was not a conspiracy to distribute drugs. *Id.* Here, Barrett was charged with conspiring to distribute and for distribution of controlled substances. A reasonable jury could have found that the government proved beyond a reasonable doubt that Barrett committed those crimes.

4. Bradley and Barrett separately challenge their Count One convictions by arguing that the government's evidence demonstrated the existence of multiple conspiracies, rather than a single conspiracy, as was charged. Bradley contends that the alleged mismatch between the evidence and indictment was a prejudicial variance, whereas Barrett raises the issue as a sufficiency-of-the-evidence challenge.

a. We review the question of whether a variance has occurred *de novo*. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). "A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* "Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the 'indictment allege[d] one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *Id.* at 235–36 (alteration in original) (quoting *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982)). We "review the evidence as to the number of conspiracies in the light most favorable to the government, considering 'the existence of a common goal, the nature of the scheme, and the overlapping of

the participants in various dealings.'" *United States v. Williamson*, 656 F. App'x 175, 183 (6th Cir. 2016) (quoting *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003)); *see Caver*, 470 F.3d at 236. While "a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy d[oes] not know every other member," each member must have "agreed to participate in what he knew to be a collective venture directed toward a common goal." *Warner*, 690 F.2d at 549 (citation omitted).

"An indictment does not charge multiple conspiracies if there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy." *United States v. Kelley*, 461 F.3d 817, 830 (6th Cir. 2006) (internal quotation marks and citation omitted). But where there are "multiple agreements to commit separate crimes," then there are several conspiracies. *United States v. Vichitvongsa*, 819 F.3d 260, 273 (6th Cir. 2016) (quoting *United States v. Broce*, 488 U.S. 568, 571 (1989)). "The ultimate question is whether the evidence shows one agreement or more than one agreement." *Id.* (quoting *In re Grand Jury Proceedings*, 797 F.2d 1377, 1380 (6th Cir. 1986)).

Bradley did not suffer a prejudicial variance because the evidence cannot reasonably be construed as only showing the existence of multiple conspiracies. *Caver*, 470 F.3d at 235. Rather, as explained, the jury reasonably concluded that the evidence proved the existence of a single chain conspiracy. *See Hitow*, 889 F.2d at 1577; *see also Corral v. United States*, 562 F. App'x 399, 408 (6th Cir. 2014) ("Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership." (quoting *United States v. Kelley*, 849 F.2d 999, 1003 (6th Cir. 1988)); *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983) (explaining that the totality of the circumstances—including the continuity of time, actors, offenses, and overt acts—supports one conspiracy to commit several crimes). Bradley alleges that he did not know either of the other defendants and did not sell counterfeit drugs to them and, therefore, cannot be responsible for aiding and abetting in the conspiracy. But again, we have explained that a defendant can be guilty of participating in a conspiracy even if he does not know all of the members or participate in all of the conspiracy's activities. *See Martinez*, 430 F.3d at 332–33; *United States v. Maliszewski*, 161 F.3d 992, 1014–15 (6th Cir. 1998).

Nor does a possibility of a variance mandate a reversal, as urged by Bradley.  For the variance to constitute reversible error, a defendant must, at the very least, show that this variance prejudiced him.  *Caver*, 470 F.3d at 237 (explaining that a variance is not *per se* prejudicial). "Where the evidence demonstrates *only* multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *Id.* (emphasis added) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  There are two forms of possible prejudice: "(1) where the defendant is unable to present his case and is 'taken by surprise by the evidence offered at trial,' *United States v. Budd*, 496 F.3d 517, 527 (6th Cir. 2007) (quoting *Berger v. United States*, 295 U.S. 78, 82 (1935)), or (2) where the defendant is 'convicted for substantive offenses committed by another[,]' *United States v. Friesel*, 224 F.3d 107, 115 (2d Cir. 2000)." *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008).

Even if there was a variance, Bradley was not prejudiced.  Bradley was convicted of participating in a single conspiracy because there was evidence of knowledge of a common scheme to distribute and sell controlled substances.  The government presented evidence of a common goal of making money by distributing drugs.  And even if we were to find that there were a series of single conspiracies, we "may reverse the jury's verdict *only* if [we] find[] that the judgment is not supported by substantial and competent evidence, whether direct or wholly circumstantial, upon the record as a whole." *United States v. Hall*, 549 F.3d 1033, 1040 (6th Cir. 2008) (emphasis added).  A defendant is prejudiced if "the evidence demonstrates *only* multiple conspiracies," *Caver*, 470 F.3d at 237 (citation omitted), which is not the case here.  A defendant seeking relief on a sufficiency-of-the-evidence claim therefore bears a "very heavy burden." *United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016).  Bradley fails to meet this burden here, because the jury could have found the existence of a single conspiracy.

b. Barrett alleges that he collaborated with Dogonski to buy what he thought were legitimate Percocet pills.  This uncharged conspiracy, he claims, is separate from and not part of the conspiracy charged in Count One.  However, the evidence is supportive of the verdict that Barrett knowingly and voluntarily participated in the conspiracy with Williams and Dogonski because the conspiracy was to distribute controlled substances.  *See Martinez*,

430 F.3d at 332–33. And, as explained, it is possible to find Barrett participated in the charged conspiracy even if he was unaware the pills were counterfeit and contained fentanyl. *Dado*, 759 F.3d at 570.

**B.  Jury Instructions on Buyer-Seller and Multiple Conspiracies**

Barrett and Bradley argue that the district court erred when it refused to provide requested pattern jury instructions about a buyer-seller relationship. Bradley also argues that the court erred by refusing to give a multiple conspiracies instruction.

We review the district court's choice of jury instructions for abuse of discretion. *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001). A district court abuses its discretion in declining to give a requested instruction when: "(1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Algee*, 599 F.3d 506, 514 (6th Cir. 2010). "We may reverse a judgment based on an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000) (cleaned up) (citation omitted).

The district court did not abuse its discretion when it declined to give a buyer-seller jury instruction. As an initial matter, we have explained that when, as here, the district court gives complete instructions on the elements of conspiracy, failure to give a buyer-seller instruction is not reversable error. *See Dado*, 759 F.3d at 568; *United States v. Musick*, 291 F. App'x 706, 729 (6th Cir. 2008); *Riggs v. United States*, 209 F.3d 828, 833 (6th Cir. 2000), *abrogation on other grounds recognized by Kumar v. United States*, 163 F. App'x 361, 366 (6th Cir. 2005).

In any event, we find that the evidence sufficiently demonstrates that Bradley had a manufacturing operation and communicated extensively with a co-conspirator, Falkowski, who then sold pills to other distributors. There is sufficient evidence in the record to show that the relationship between Barrett and Dogonski was that of a trusted supplier and distributor. Dogonski brokered a deal between Williams and Barrett, and neither Barrett nor Williams were

mere customers purchasing drugs for personal use.  Thus, the district court did not abuse its discretion in refusing to give the buyer-seller instruction to the jury.

The district court also did not err in refusing to give the multiple-conspiracies instruction to the jury.  "A district court is not required to give a multiple conspiracies instruction where only one conspiracy is alleged and proved."  *United States v. Ghazaleh*, 58 F.3d 240, 244 (6th Cir. 1995) (quoting *United States v. Lash*, 937 F.2d 1077, 1086 (6th Cir. 1991) (collecting cases)).  As explained above, the jury found the existence of a single conspiracy beyond reasonable doubt, and the evidence is sufficient to support that conclusion.  The district court's choice not to give a multiple-conspiracies instruction thus was not reversable error.

## C.  Jury Instructions on the Sentencing Enhancement

Barrett also challenges the district court's jury instructions related to the application of § 841(b)(1)(C)'s penalty enhancement.  "Section 841(b)(1)(C) sets the maximum penalty for a violation of § 841(a)(1) and imposes a sentence of not more than twenty years" unless the use of the substance results in "death or serious bodily injury."  *United States v. Jeffries*, 958 F.3d 517, 519 (6th Cir. 2020) (quoting § 841(b)(1)(C)).  If that is the case, the defendant "shall be sentenced to a term of imprisonment of not less than twenty years or more than life."  § 841(b)(1)(C).  For the enhancement to apply, the government must prove that (1) the defendant knowingly or intentionally distributed a controlled substance; and (2) that a death resulted from that distribution.  *See Burrage v. United States*, 571 U.S. 204, 210 (2014).  "[W]here use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury."  *Id.* at 218–19.  But-for causation occurs when the distributed drug "'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance."  *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (citation omitted).

We view the evidence supporting Barrett's sentencing enhancement in the light most favorable to the prosecution and decide whether "*any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  "As § 841(b)(1)(C)'s penalty enhancement increases the statutory maximum penalty, it must be charged in the indictment and proven beyond a reasonable doubt by the prosecution." *Jeffries*, 958 F.3d at 519 (citing *Alleyne v. United States*, 570 U.S. 99, 107–08 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Barrett argues that the district court should have told the jury that it could not convict him of this enhancement unless it found that he had some sort of culpable mental state regarding the victim's death and serious bodily injury.  Specifically, Barrett contends that the statute requires proof that the defendant "*knew* the risk of harm and chose to proceed."  Barrett did not raise this argument before the district court, and we therefore review it for plain error.  *See United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006).  To prevail on plain error review, Barrett must show that (1) an error occurred, (2) it was obvious or clear, (3) it affected his substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 733–36 (1993).

The government asserts that "[t]he plain language of § 841(b)(1)(C) does not attach any *mens rea* requirement to the death-or-bodily-injury enhancement, and Barrett does not suggest otherwise."  Barrett argues that the Due Process Clause requires the Court to infer a *mens rea* requirement in order to make the statute constitutional because (1) the enhancement increases the statutory range and thus effectively "creates a separate crime" and (2) this purportedly separate crime must have a *mens rea* requirement or else it will be a strict liability offense that threatens to criminalize innocent conduct, in violation of *Morissette v. United States*, 342 U.S. 246 (1952), *Staples v. United States*, 511 U.S. 600 (1994), and related cases.  But we have held that "[i]t is always foreseeable that a violation of § 841(a)(1) will involve an ultimate user of the substance and that death or injury may result from that use." *Jeffries*, 958 F.3d at 524.  Accordingly, the government does not need to demonstrate foreseeability to apply the § 841(b)(1)(C) enhancement. *Id.*  And even if the government had been required to prove foreseeability, Barrett was not prejudiced by the error to not provide these jury instructions.  Here, the manufacture of drugs laced with fentanyl—a highly lethal drug—does not make foreseeability so uncertain. We therefore find that no plain error occurred.

To prove that Bradley was liable for the death of others, moreover, the government cannot rely on *Pinkerton* liability, and must show that he was in the chain of distribution that caused the victim's death or injury. *United States v. Hamm*, 952 F.3d 728, 741 (6th Cir. 2020). The government did so here. It presented testimonial evidence from toxicology experts that indicated that the counterfeit pills containing fentanyl were the cause of the overdoses and demonstrated that Bradley was a manufacturer of this highly lethal drug. Because the government properly situated Bradley in the chain of distribution, the § 841(b)(1)(C) enhancement was properly applied to him. *See id.* at 747. Therefore, the district court did not err in applying the § 841(b)(1)(C) enhancement.

**D. Barrett's and Bradley's Challenges to Counts Two through Ten of the Indictment**

Barrett and Bradley argue that the district court erred in denying their motions to dismiss counts Two through Ten of the Fifth Superseding Indictment. We consider each defendant's arguments in turn.

1. Barrett argues that the indictment included multiple counts that were duplicitous. "Whether an indictment is duplicitous is a question of law that this Court reviews *de novo*." *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007).

"Separate offenses must be charged in separate counts of an indictment." *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011) (citing Fed. R. Crim. P. 8(a)). "A duplicitous indictment charges separate offenses within a single count. The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *United States v. Anderson*, 605 F.3d 404, 414 (6th Cir. 2010) (quoting *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997). Duplicitous indictments do not allow "the jury to convict on one offense and acquit on another," which is why they implicate the Sixth Amendment guarantee of jury unanimity. *Washington*, 127 F.3d at 513.

Barrett argues that Counts Two, Three, Four, Seven, Eight and Nine (each charging a violation of 21 U.S.C. § 841(a)(1)) were duplicitous because possession with intent to distribute and distribution are distinct charges. We disagree. Disjunctive offenses like § 841(a)(1), which

identifies distribution and possession with intent to distribute as different means to commit the offense, can be charged conjunctively in an indictment. *See United States v. McAuliffe*, 490 F.3d 526, 534 (6th Cir. 2007) ("It is settled law that an offense may be charged conjunctively in an indictment where a statute denounces the offense disjunctively." (quoting *United States v. Murph*, 707 F.2d 895, 896 (6th Cir. 1983) (per curiam))); *see also* Fed. R. Crim. 7(c)(1) ("A count may allege that . . . the defendant committed [the offense] by one or more specified means.").

Barrett also argues that distribution and aiding and abetting are two different crimes and that it was improper to combine both under the multiple Counts. Barrett asserts that Counts Two, Three, Four, Seven, Eight, and Nine are "identical" except that they list injury to a specific individual. As such, Barrett asks this Court to order a new trial "because the vast amount of prejudicial and otherwise inadmissible evidence emanating from the conspiracy count and the 'aider and abettor' language renders singular assessment of the substantive counts impossible." Again, we are unpersuaded. An indictment can include an aiding-and-abetting theory without being duplicitous. *See United States v. VanderZwaag*, 467 F. App'x 402, 407 (6th Cir. 2012) (quoting *United States v. Banks*, 27 F. App'x 354, 359 (6th Cir. 2001); *United States v. Dean*, 969 F.2d 187, 195 (6th Cir. 1992).

Barrett further argues that the charging of the § 841(b)(1)(C) enhancement provision "is significant because it adds an element to the distribution offense, but does not implicate the possession charge." But the district court correctly explained that "[t]he addition of Section 841(b) in the indictment is not an allegation of a separate crime, but rather [serves to] notify[] defendant of a mandatory minimum on those counts." The district court also cured any potential duplicity issue with unanimity instructions to the jury. *See United States v. Hendrickson*, 822 F.3d 812, 822 (6th Cir. 2016) ("Specific unanimity instructions are a method of curing 'duplicitous' charges . . . ."); *United States v. Adesida*, 129 F.3d 846, 849 (6th Cir. 1997).

2. In turn, Bradley contends that there was insufficient evidence to demonstrate that he aided and abetted co-conspirators in possessing fentanyl-mixture drugs, with the intent to distribute, in violation of 18 U.S.C. § 2. He therefore argues that his convictions on Counts 2–10 should be vacated. For sufficiency-of-the-evidence challenges, the question is whether

"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis omitted).

Bradley cannot overcome that high bar. "To prove that [a defendant] aided and abetted drug transactions under 18 U.S.C. § 2, the government must establish that [he] participated in the venture as something []he wished to bring about and sought to make succeed." *United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999). We find that there was sufficient evidence that Bradley knowingly and intentionally participated in the manufacture of counterfeit pills and obtained a portion of the pills for no other purpose than to sell to others. His manufactured pills passed through several distributors and ended up in the hands of end users who overdosed. There is no requirement that the government prove that Bradley either distributed to the end user himself or directly aided and abetted the person who did distribute to the end user. Rather, "a defendant may be convicted of distribution of controlled substances by virtue of being in a conspiracy with the perpetrator of the substantive distribution offense." *Hamm*, 952 F.3d at 738. As such, a rational trier of fact could have found Bradley guilty beyond a reasonable doubt of these offenses.

**III.**

**A.  Defendants' Motions to Suppress Statements Made During Interrogations**

All three defendants argue that the district court erred in denying their motions to suppress incriminating statements made during separate interrogations with law enforcement. "When reviewing the denial of a motion to suppress, we will set aside the district court's factual findings only if they are clearly erroneous, but will review *de novo* the court's conclusions of law." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015) (emphasis added). In this circumstance, we review "the evidence in the light most likely to support the district court's decision." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009) (citation and internal quotation marks omitted).

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless" law enforcement officials advised the defendant of his "right to remain silent, that anything he says can be used against him in a court of law, that

he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 444, 479 (1966). *Miranda* does not apply "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Instead, a person is in custody for purposes of *Miranda* if, "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (cleaned up) (citations omitted). We consider four non-exhaustive factors to guide this analysis: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). A determination of whether the defendant was in custody during interrogation raises a "mixed question of fact and law, and is thus reviewed *de novo*." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).

*Miranda* warnings need not be formulaic but must reasonably convey the rights protected. *Duckworth v. Eagan*, 492 U.S. 195, 202–203 (1989); *see also United States v. Clayton*, 937 F.3d 630, 638–41 (6th Cir. 2019). Once *Miranda* rights are read, a suspect may either waive their rights or invoke them. *See Berghuis v. Thompkins*, 560 U.S. 370, 381–384 (2010). "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* at 388–89. A waiver, therefore, can be implicit, but an invocation must be explicit. *See id.* at 381–84; *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979).

Even so, a waiver must be made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. This is so if the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To guide this analysis, "[we] look[] at the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.'" *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Law enforcement may not coerce a suspect into waiving his *Miranda*

rights. We will accordingly invalidate a *Miranda* waiver if: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). "[We] review[] a trial court's legal conclusions on *Miranda* waivers *de novo*, and findings of fact underlying those conclusions for clear error." *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010) (citation and internal quotation marks omitted).

### 1. Barrett's Motion to Suppress

Barrett argues that he was not advised of his *Miranda* rights during his first interrogation on July 7, 2016 and that he did not waive his rights during his second interrogation on July 11, 2016. We disagree.

During the evidentiary hearing on Barrett's motion to suppress, Special Agent Mabry testified as to the details of what Barrett's warning on July 7 entailed, covering the four categories of warnings *Miranda* requires. Special Agent Ellen Roy also explained that on July 11, she read each *Miranda* right to Barrett, who responded "Alright." Special Agent Roy testified that she told Barrett that "if [he] can't afford an attorney, one will be provided." To this, Barrett again responded, "Alright." Special Agent Roy further confirmed that Barrett understood his rights, asking, "Okay? Do you understand that?" And Barrett responded, "Yes, Ma'am." Special Agent Roy proceeded to ask Barrett if he wanted to speak with her, and he agreed after confirming that he understood the nature of the discussion. The record thus shows that on July 7 and July 11, Barrett was advised of his rights and waived them knowingly and voluntarily. Accordingly, the district court did not err in denying Barrett's motion to suppress.

### 2. Bradley's Motion to Suppress

Bradley makes an argument similar to Barrett's as to his custodial interrogation. But each officer who testified at trial agreed that Bradley affirmatively responded to and seemed to understand his *Miranda* rights. They further testified that Bradley was never offered a proffer agreement or told his statements would be protected by such agreement.

Bradley was interviewed by DEA Special Agent John Krieger and Metro Nashville Police Department Detective Fink. Bradley communicated a desire to cooperate with the officers throughout the interview. He described himself as "your star witness" and told the officers "It's over, y'all got me, it ain't don't matter . . . I'm testifying!" He also shared his knowledge of the ongoing criminal proceedings, noting that he "knew [officers] were coming" and had already reviewed "a lot of paperwork. . . it was [another indicted conspirator's] motion of discovery." The testimonial evidence at trial shows that Bradley knowingly waived his rights, was not coerced into talking, and that the district court did not err in denying his motion to suppress the statements.

### 3. Williams' Motion to Suppress

Williams also claims that he did not knowingly waive his *Miranda* rights during the interrogation. The record shows that Williams went voluntarily to the station after law enforcement offered to give him a ride. Once at the station, Detective Massey told Williams, "You're not under arrest. You still came up here voluntarily." Williams was not handcuffed or restrained, and Detective Massey informed him that he could leave if he wished. Indeed, Williams then told the officer that he wished to leave and the officers escorted him out of the building.

Once outside, Williams started talking to the officers, who informed him that if he wanted to keep talking, he would have to come back inside to speak with them. Williams then agreed to go back into the station with Detective Massey. He was once again informed that he was not under arrest and could leave at any time: "[I]f you choose not to [talk], then we'll do like we did a minute ago, we'll call a ride, you'll be out of here. Okay?" Detective Massey then Mirandized Williams and obtained a written waiver. After about 34 minutes, Williams chose to end the interview again and left the station. As such, Williams knowingly waived his rights during the interrogation.

## B. Williams' Motion to Suppress the Evidence Seized from His Phone

Williams also argues that the district court erred in denying his motion to suppress the evidence obtained from his cell phone. We review a "district court's factual findings in a

suppression hearing under the clearly erroneous standard and the district court's conclusions of law *de novo*." *United States v. Avery*, 137 F.3d 343, 348 (6th Cir. 1997).

The Fourth Amendment to the United States Constitution protects "the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  A seizure of personal property is "*per se* unreasonable . . . unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).  If "law enforcement authorities have probable cause to believe that a container holds . . . evidence of a crime" and the "exigencies of the circumstances demand it," seizure of the container "pending issuance of a warrant to examine the contents" is permitted. *Id.* (collecting cases).  However, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (internal quotation marks omitted).  The government has the burden of proving the legality of a warrantless search. *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987) (citing *United States v. Matlock*, 415 U.S. 164, 177 (1974)).

We review a district court's legal conclusion as to exigency *de novo* but will not disturb a district court's factual findings on the existence of exigent circumstances unless those findings are clearly erroneous.  *United States v. Gaitan-Acevedo*, 148 F.3d 577, 585 (6th Cir. 1998). A finding is clearly erroneous if we are left with the "definite and firm conviction that a mistake has been committed" after viewing the entirety of the evidence. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (quoting *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003)).

In reviewing the district court's findings that sufficient exigent circumstances existed to justify a warrantless seizure, we consider the "totality of the circumstances and the inherent necessities of the situation." *Brooks v. Rothe*, 577 F.3d 701, 708 (6th Cir. 2009) (citing *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996)).  "The inquiry focuses not on an officer's subjective intentions, but on whether an objectively reasonable officer could have believed that exigent circumstances existed." *Id.*

Here, the government demonstrated that during Williams' interrogation, he indicated that he had communicated with "Bo" (Valles) and Dogonski regarding the pills. The officers thus had an objectively reasonable basis for concluding that evidence of a crime existed on Williams' cell phone, and that it could be destroyed if the cell phone was not seized immediately. While courts must carefully balance governmental interests with the privacy concerns of individuals who have information stored on personal devices, there is evidence here of the government's strong interest in preventing the destruction of evidence that could have potentially saved lives of other victims who bought counterfeit pills. The government interest here thus outweighed the individual interest. Accordingly, the brief, warrantless seizure was justified under the exigent circumstances exception to the warrant requirement.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the defendants' convictions and sentences.